**Leslie D. FERRERO, Plaintiff,**

v.

**William J. HENDERSON, Postmaster General of the United States Postal Service, et al., Defendants.**

**No. 3:00CV462.**

United States District Court,
S.D. Ohio,
Western Division.

Sept. 14, 2004.

874

Lee Hornberger, Traverse City, MI, for Leslie D Ferrero, Plaintiff.

William Martin Slonaker, Kettering, OH, for William M Slonaker, Mediator.

Pamela M Stanek, United States Attorney's Office, Dayton, OH, for U.S. Postal Service, Defendant.

### ORDER

OVINGTON, United States Magistrate Judge.

## I. INTRODUCTION

Plaintiff Leslie D. Ferrero brings this employment discrimination case under the Rehabilitation Act of 1973 ("the Rehabilitation Act"), 29 U.S.C. §§ 791, et seq., and the Family and Medical Leave Act of 1993 ("the FMLA"), 29 U.S.C. §§ 2601, et seq. She brings her claims under the Rehabilitation Act against Defendant William J. Henderson, former Postmaster General of the United States Postal Service; she brings her claim under the FMLA against the United States Postal Service.[1]

This case is before the Court, following a four-day bench trial, on Ferrero's Proposed Findings of Fact and Conclusions of Law (Doc. # 120), Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. # s121–125), and the record as a whole. The parties have consented to jurisdiction under this Judicial Officer pursuant to 28 U.S.C. § 636(c).

As Ferrero summarizes, "The essential issues in this case are whether the defendant discriminated against, harassed, constructively discharged, terminated, or retaliated against [her] in violation of the Rehabilitation Act or the· FMLA." (Doc. # 120 at 2).

The following opinion contains findings of fact and conclusions of law as required under Fed.R.Civ.P. 52(a). The Court reaches its findings of fact based on a preponderance of the admissible evidence. In addition, the Court notes that Defendants' Motion under Fed.R.Civ.P. 50 (Tr. 849), which was taken under submission at the close of Ferrero's case in chief and which is properly brought under Rule 52(c), is denied because there is an evidentiary basis to support Ferrero's claim of retaliatory termination under the Rehabilitation Act. *See* Fed. R. 52(c); *see also infra,* § III(B).

## II. BACKGROUND

### A. *Ferrero's Initial Employment and Injuries*

On November 26, 1994, Ferrero began working part time for the United States Postal Service at its Post Office in Cedarville, Ohio. The Postmaster of the Cedarville Post Office was Roy Conover. Conover hired Ferrero and was her immediate supervisor.

The Cedarville Post Office was not a large facility. In 1994, there were approximately nine Postal Service employees working at the Cedarville Post Office including both Ferrero and Conover. (Tr. 384–86).

Ferrero began working as a rural carrier associate. This involved substituting for a regular mail carrier on his or her day off. (Tr. 651). Approximately two years later, in December 1996, Ferrero began working full time and eventually took over

---

1. On June 1, 2001, John E. Potter became the Postmaster General. Pursuant to Fed. R.Civ.P. 25(d)(1), he is automatically substituted as a party in this case. *See Hall v. United States Postal Service,* 857 F.2d 1073, 1076 n. 1 (6th Cir.1988). William J. Henderson is therefore dismissed as a Defendant in this case. *Id.* at n. 2. This has no

practical effect on this case because Ferrero must direct her claims against these individuals in their official capacity as the Postmaster General rather than against them in their individual capacities. *See* Fed.R.Civ.P. 25(d)(1). The case caption remains the same for ease and clarity of docketing.

the job duties of a regular mail carrier. (Tr. 386).

Prior to 1997 Ferrero was a happy friendly person, who was very lighthearted, exuberant and outgoing. (Tr. 112). She viewed herself as "energetic, outgoing, and friendly." (Tr. 657). During her first years with the Postal Service, Ferrero had no difficulty. She acknowledges that prior to July 7, 1997, Conover treated her "fairly and appropriately." (Doc. # 98 at ¶ 17; Doc. # 120 at ¶ 9).

On July 7, 1997, Ferrero suffered an on-the-job injury when she tripped on a curb and fell. (Tr. 659). After she fell, she laid there approximately ten minutes. She was scared because she wanted to finish making her mail deliveries. (Tr. 660). She therefore got up, completed her deliveries in forty-five minutes, and returned to the Cedarville Post Office.

Ferrero reported her fall and injuries to Conover who became "really angry," according to Ferrero. (Tr. 661). Conover did not believe Ferrero was injured; he believed she was lying to him. (Tr. 391–92; 518–19). Conover told Ferrero to complete an accident report (Defendant's Exhibit 5) and asked her if she needed medical attention. She declined medical attention and drove home. *Id.*

### B. *July 7—August 11, 1997*

Ferrero's pain increased during the night of July 7–8, 1997. When Ferrero reported to work on July 8, 1997, she told Conover that she needed to see a doctor. Pursuant to Postal Service policy, Conover drove Ferrero to a see the physician retained by the Postal Service. (Tr. 393–94). After the physician examined Ferrero and had x-rays taken, he prescribed pain medication and imposed three work restrictions: no lifting over ten pounds, no raising her left arm above shoulder height, and no driving with her left arm. (Tr. 528, 662; Defendant's Exh. 6 at 1). The physi-

cian informed Conover about these work restrictions, and also told Conover that Ferrero needed to take a prescription pain medication. (Tr. 661–62).

After they returned to the Cedarville Post Officer, Conover instructed Ferrero that she would have to abide by her work restrictions. (Tr. 530–31). Although Conover knew the physician had prescribed pain medication for Ferrero (Tr. 662), Conover instructed her to case mail. This involved looking at the address on a piece of mail and putting it in a slot labeled with the same address. (Tr. 529). This work caused Ferrero further pain, but she did not tell Conover because he appeared to her to be "extremely agitated." (Plaintiff's Exh. 4 at 109). Significantly, this work prevented Ferrero from obtaining the prescribed pain medication until she completed casing the mail as Conover had instructed. (Tr. 662).

On July 9, 1997, Ferrero reported to work. Although she cased mail and separated and labeled twenty-two parcels, this work caused her pain. Ferrero alleges that Conover "just snickered and ignored the situation." (Plaintiff's Exh. 4 at 111). He also told her to be sure not to lift her left arm over shoulder height but then smiled, snickered, and walked away. *Id.*

On July 10, 1997, Ferrero again cased mail. She had an appointment that day for a physical-therapy evaluation. Conover told her that there was no way her fall caused those injuries and that physical therapy was "a real joke." *Id.* at 111–12. The next day, according to Ferrero, Conover "was at the boiling point." *Id.* at 112. She continued to work in pain. By this time, her co-workers were avoiding conversation with her. *Id.* This kept them out of trouble with Conover.

Ferrero worked on July 12 and 14, 1997. She noted on July 14th that her co-work-

ers did not speak to her unless she spoke to them first. *Id.* at 113.

On July 15, 1997, after reporting to work and casing mail, Ferrero went to a follow-up visit to the Postal Service physician. (Plaintiff's Exh. 4 at 114). This resulted in a more limited work restriction: no lifting over five pounds. (Defendant's Exh. 6 at 4). When she returned to work and gave the physician's further restriction to Conover, he "blew up—threw the paper up in the air ...." (Plaintiff's Exh. 4 at 114).

Ferrero cased mail on July 16, 1997, went to physical therapy, and returned to work. She answered phones and continued to be in a lot of pain. *Id.* at 115. On July 17, 1997, Ferrero went to another follow-up visit with the Postal Service physician. The physician reported that Ferrero would be unable to return to work. (Defendant's Exh. 6 at 6). Conover phoned Ferrero at 11:30 P.M. and instructed her to report to work the next day, which she did. (Plaintiff's Exh. 4 at 115). The next day, Ferrero overheard Conover ask a union steward "how to get rid of her, what he could do." (Tr. 668; Plaintiff's Exh. 4 at 115–16). She overheard this comment because Conover had instructed her to sit in an area where she could hear his conversation with the union steward. *See* Tr. 668; Plaintiff's Exh. 5 at 116.

The Postal Service physician's treatment notes indicate that on July 18, 1997, he received a call from the Postal Service's Medical Officer in Cincinnati offering Ferrero a job answering telephones only. (Defendant's Exh. 6 at 5). The physician noted, "This is acceptable job placement if honored by management. Will call [patient] to inform." *Id.* at 5, 8. Conover testified that he permitted Ferrero to work answering phones only. (Tr. 540).

Ferrero worked on July 18 and 19, 1999 (Plaintiff's Exh. 4 at 118–19). On July 21–25, 1997, Ferrero received the "silent treatment" from her co-workers. *Id.* at

120–21. On July 25, 1997, Conover snickered and told Ferrero—in front of her co-workers—that "it doesn't pay to be hurt." *Id.* at 122.

On July 26, 1997, Conover was not at work. Plaintiff's Exh. 4 at 122. Ferrero's co-workers were a lot more friendly, and she worked without negative incident. *Id.* By this time, however, Ferrero had begun to vomit and experience other symptoms. She called in sick on her next scheduled work day, Monday, July 28, 1997, and continued to be sick through the week. *Id.* at 123. She went to her doctor on July 31, 1997 and her blood pressure was high. *Id.* She was real shaky, vomiting, very dizzy, had severe diarrhea, was clammy, and had high blood pressure. (Tr. 673). Ferrero's physician, informed her that she was suffering from "severe anxiety." (Tr. 673, Plaintiff's Exh. 3).

On August 1, 1997, Shahda Aziz, M.D., Ferrero's physician, completed a certificate stating that Ferrero would not be able to return to work until August 4, 1997. Dr. Aziz noted, "work related 'stress' (severe) in which [patient] is vomiting/diarrhea." (Defendant's Exh. 6 at 11). Also on August 1, 1997, the Postal Service physician reported that Ferrero could work with the following restrictions: lifting, pulling, or pushing up to two pounds. (Defendant's Exh. 6 at 12).

At some point during the summer of 1997, Ferrero contacted Lucille Welch, an employee of the Postal Service in Cincinnati who handled injury or workers' compensation claims. (Tr. 665, Defendant's Exh. 10 at 7). Ferrero told Welch about Conover's harassment. (Tr. 665). Near August 4, 1997, Welch informed Ferrero that Conover went "ballistic on the phone with her [Welch]." (Tr. 671; Defendant's Exh. 10 at 7). Conover testified at trial that he never went ballistic in a conversation with Welch about Ferrero. (Tr. 634).

Ferrero returned to work on Monday, August 4, 1997, although she still felt "horrible" and "depressed." (Tr. 675; Plaintiff's Exh. 4 at 125). She was still vomiting and was unable to sleep through the night because of the stress Conover had caused. (Tr. 675). She worked through the week, however, and still experienced the "silent treatment" from her co-workers. (Tr. 675; Plaintiff's Exh. 4 at 126–27). On August 7, 1997, Conover said in a very loud voice, "If anyone ever crosses me or does something I don't like, I always get even. Right or wrong I always get even. It's been that way for 35 years[,] that's why no on every [sic] messes with me." (Plaintiff's Exh. 4 at 127). On direct examination at trial, Conover testified that he did not say this. (Tr. 568). On cross examination, however, Conover acknowledged that during his deposition he testified that it was possible he had said this. (Tr. 636). He explained at trial that the more he thought about, the more he believed it was not possible that he had said this. (Tr. 636).

On August 8, 1997, the Postal Service physician altered Ferrero's work restrictions to lifting, pushing, and pulling up to five pounds. (Defendant's Exh. 6 at 13). Only four days later, however, the Postal Service physician reported that Ferrero was unable to report to work. (Defendant's Exh. 6 at 14). This occurred just after the following events on August 11, 1997, the last day Ferrero reported to work.

At around 10:00 A.M. on August 11, 1997, Ferrero went outside for a break. She describes the next events as follows:

[A] customer ... pulled in the parking lot. And came up and talked to me and said: Leslie, what is going on. And I kind of asked her what she meant. And she said, something about me filing a sexual harassment suit and that Mr. Conover was going to get even with me. He was out to get me.

And I directly walked back in the post office. A[sic] told Mr. Conover that I was sick and I went home directly.... (Tr. 675).

Ferrero testified that she did not report to work after this because she "couldn't tolerate the environment. It was hostile. I was sick." (Tr. 678).

## C. *August 15, 1997 through September 1997*

On August 15, 1997, the Postal Service physician estimated that Ferrero would be able to return to work on September 2, 1997. (Defendant's Exh. 6 at 15). Also on August 15, 1997, a physician reported to an Officer of Workers' Compensation that Ferrero was suffering from costocondritis,[2] chest wall contusion, and concurrent workplace stress. (Defendant's Exh. 7). The physician noted that Ferrero had been referred to "[K]athy O'Hearn, Ph.D. for supportive counseling." *Id.; see* Plaintiff's Exh. 4 at 129.

On August 27, 1997, the Postal Service physician reported that Ferrero would be able to return to work on September 2, 1997 with restrictions preventing her from lifting, pushing, pulling more than ten pounds, and from twisting more than six to ten times per hour. (Defendant's Exh. 6 at 17). Ferrero did not return to work on September 2, 1997. (Tr. 678).

On September 10, 1997, the date of Ferrero's next scheduled appointment with the Postal Service physician, the physician reported that Ferrero was able to return to work without restrictions. (Defendant's Exh. 6 at 18). This conclusion, however, failed to take into consideration the signifi-

---

**2.** Costochondritis involves "[i]nflammation of the costochondral joints of the chest, which can cause chest pain." Taber's Cyclopedic Medical Dictionary at 475 (19th Ed.2001).

cant psychological symptoms Ferrero was then suffering. *See id.* at 18–19.

On September 15, 1997, the Department of Labor accepted Ferrero's claim for continued pay due to her "contusion of the left side of the chest...." (Defendant's Exh. 27 at 36). One week later, Conover filed a form with the Department of Labor challenging, on behalf of the Postal Service, Ferrero's claim for continued pay. (Defendant's Exh. 27 at 38). The Department of Labor eventually disallowed Ferrero's claim for continued pay after finding that "[t]he evidence on file fails to establish that an emotional injury or condition was sustained or incurred as alleged due to factors of the employment." (Defendant's Exh. 27 at 41).

In early September 1997, Ferrero's physician referred her to psychologist Kathleen O'Hearn, Ph.D.

## D. Ferrero's Psychological *Symptoms and Adjustment Disorder*

In September 1997, Dr. O'Hearn certified Ferrero as unable to work. (Tr. 676; Defendant's Exhs. 39–40). On September 8, 1997, Ferrero filed a form with the Department of Labor titled, "Notice of Occupational Disease and Claim for Compensation." (Defendant's Exh. 27 at 37). Ferrero stated in this form that she was suffering from an "anxiety disorder, secondary to injury." *Id.*

Dr. O'Hearn treated Ferrero until late September 1997 when she referred Ferrero to Kathleen J. Burch, Psy.D., R.N. (Plaintiff's Exh. 42). Burch began treating Ferrero in late September 1997 and continued treating her until December 1999. (Tr. 244).

Burch initially diagnosed Ferrero as suffering from anxiety disorder. After additional sessions with Ferrero, Burch altered her diagnosis to adjustment disorder. According to Burch, a person suffering from an adjustment disorder experiences mixed symptoms of anxiety and depression due to an identifiable stressor. (Tr. 247, 253). Burch recognized that Ferrero suffered a range of symptoms of anxiety due to her work situation. (Tr. 248, 250). The stressor that caused Ferrero to seek mental health treatment was "the injury she had had and the response of her supervisor," according to Burch. (Tr. 247).

Stephen Roy, a friend of Ferrero's who did not work for the Postal Service, testified that before 1997, Ferrero was a very lighthearted, exuberant outgoing, happy, and friendly type of person who "made a lot of friends and knew a lot of people." (Tr. 112–13). She was, in Roy's words, "very outgoing, [a] very great person. Lots of fun to be around." (Tr. 114).

Roy raises pure bred sheep. (Tr. 112). Ferrero worked for him showing sheep in national and international livestock shows. (Tr. 112). According to Roy, Ferrero "is was [a] very well renowned showman and fitter." (Tr. 112). Roy respected Ferrero because she helped a lot of people in the livestock-showing industry. (Tr. 114). Referring to her activities in helping others, especially teaching children about showing livestock, Roy characterized Ferrero as "one of the top people in the country." (Tr. 114).

According to Roy, about one month after Ferrero was injured in July 1997, he asked her to show sheep for him at a National show in November 1997. (Tr. 113). Ferrero was unable, however, to show sheep for Roy at this show and did not work for Roy after July 1997. (Tr. 113). Although Ferrero attended two or three livestock shows during the year after her injuries, Roy noticed that Ferrero "looked as though she was very stressed. And often would have a stiff neck type of thing. And she seldom smiled." (Tr. 115). Roy further described Ferrero after July 1997 as "quite reclusive...." (Tr. 117).

In a letter dated January 11, 1998, Burch opined that Ferrero would never be able to return to work for the Postal Service "because of her feelings about the way she has been treated...." (Defendant's Exh.45 at 26). In October 1998, Burch wrote that Ferrero was continuing to experience "significant symptoms of depression, anxiety, and neck pain and spasms. She continues to suffer loss of teeth and gastro-intestinal distress. She feels easily overstressed and exhausted." *Id.* at 7. In March and December 1999, Burch confirmed her opinion that Ferrero "is unlikely to ever be able to tolerate work with the Postal Service." *Id.* at 28–31.

### E. *Conover*

As described above, *supra,* § II(B), Conover began to treat Ferrero differently after she fell on July 7, 1997. According to Ferrero, Conover became "real ornery. And he just wouldn't let up on anything. He was awful." (Tr. 664). This caused Ferrero serious emotional stress. As discussed in more detail above, § II(D), Ferrero sought and received psychological treatment due to the stress caused by Conover's conduct.

Conover testified that he did not believe Ferrero's claim to a physical injury because he did not see any physical evidence of injury. (Tr. 459, 518–19). He testified, however, that he was not angry with Ferrero and that he did not act mean or rude to Ferrero between July 7 and August 14, 1997, or at any time after she was hired. (Tr. 548–49). Ferrero, in contrast, testified that Conover "just wouldn't relent I mean he is a big man and when he gets in your face, you are intimidated." (Tr. 661).

One of Ferrero's co-workers, Sheila Zeman, testified that after she suffered an on-the-job hand injury, Conover began to treat her differently. (Tr. 186–87). Zeman explained, "His attitude changed. He was less friendly. He was harsh about different things. He just—he seemed like he tried to intimidate me after the injury." (Tr. 187).

Zeman testified that when one of her co-workers, Nancy Hatten, called in sick, Conover became irritated and a couple of times caller her "a bitch." (Tr. 189–90). Ferrero also heard the same kind of talk from Conover. (Tr. 686). Conover testified that it was possible he called an employee "a bitch." (Tr. 556).

At some point Zeman obtained a transfer to a different Post Office because the environment at the Cedarville Post Office was not friendly. (Tr. 191). Zeman attributed the cause of this to Conover. She testified:

I can give examples. His frustration when Nancy would not be at work. If someone was sick, that seemed to irritate him. And he shared different things about Leslie's [Ferrero's] employment as far as her on the job situation. How she handled her job. And what she did and what she didn't do right. And then when things would happen, there would be other employees in the post office that would not have much to do with you or say anything because no one wanted to cross Mr. Conover.

(Tr. 191).

Before 1997, Conover never drove past Ferrero's home. On several occasions after the summer of 1997 and into 1998, Ferrero saw Conover drive slowly past her home. (Tr. 681). She viewed this as surveillance and harassment. (Tr. 681; *see* Doc. # 120 at ¶ 43). In late 1997 and after 1997, Zeman saw Conover drive past Ferrero's home on three or four occasions. (Tr. 188). Zeman recognized Conover's car because it had personalized license plates. (Tr. 188).

On March 31, 2002, when Conover retired, he took documents concerning Fer-

rero and other employees to his home. (Court Exh. I; *see* Tr. 378, 381–83, 469). These documents concerning Ferrero included, in part, Conover's handwritten notes; Postal Service documents, such as those relating to Ferrero's EEO proceedings; and Ferrero's personal medical documents including documents related to the mental health treatment she received. (Court Exh. I). Although Conover shredded other employee's files, he did not shred Ferrero's documents, because he "knew there was an action pending and [he] thought [he] might need some of [the] notes." (Tr. 515; *see* 381–83).

Conover testified that he unknowingly required Ferrero to perform work in excess of her restrictions. (Tr. 462, 536–37). The work Conover required her to perform beyond her restrictions included pushing a cart with mail and parcels in it through doors. (Tr. 685). This cart weighed forty-four pounds when empty. (Tr. 685). Ferrero had to push the cart through two huge metal doors. (Tr. 686). The Postal Service determined that Conover did not work Ferrero beyond her restrictions. (Plaintiff's Exh. 15).

### F. *Ferrero's EEO Proceedings*

In September 1997 Ferrero filed a document seeking informal pre-complaint counseling with the Postal Service's Equal Employment Opportunity ("EEO") office. (Plaintiff's Exh. 6). This led to "counseling," a term the Postal Service's EEO office uses to describe the investigation it conducts and its discussion with management to attempt to resolve the pre-complaint. (Tr. 45).

On November 18, 1997, a mediation session occurred involving a federal mediator, Ferrero, her attorney, and Conover. At that time, Ferrero had no intention of returning to work. (Tr. 758). Ferrero testified, "I just wanted it to be over with. I wanted Roy [Conover] to acknowledge

what he had done. I wanted the post office to acknowledge that I was ill. I still wanted to work for them, but I knew that I couldn't by that time." (Tr. 679).

During the mediation, according to Ferrero, Conover became "red faced and angry. And about that time the mediator terminated the meeting. . . . And Mr. Conover grabbed the table and you could see his knuckles and they were really white and [he] picked it up just a little bit." (Tr. 679).

Ferrero's attorney at the mediation was Augustus Ross. Attorney Ross testified at trial that Conover was not prepared to go forward because he was not represented. (Tr. 217). Attorney Ross described Conover as appearing "very agitated. And, of course, [he] always leered at Ms. Ferrero." (Tr. 217; *see* Tr. 219). Attorney Ross testified that Conover's "blood pressure was up. He was very red. . . . [A]s soon as the mediator said he was permitted to leave, he grabbed the table and jumped up and the table bounced." (Tr. 218).

In December 1997, Ferrero filed with the EEO office a document titled "EEO Complaint of Discrimination in the Postal Service." (Plaintiff's Exh. 8). This Complaint contained a box designated "disability," which was checkmarked. Ferrero alleged that the discrimination began on July 7, 1997, noting (through attorney Ross) as follows:

> Over a period of time. When injury occurred Roy Conover didn't believe Ms. Ferrero. He worked her against Workers Comp doctors orders; threatened her; followed her. Roy Conover caused a hostile work environment for Ms. Ferrero, he followed her, called her late at night, had others follow her. Roy Conover, by his actions, caused Ms. Ferrero physical, psychological and emotional

damage causing her not to be able to move her neck without medication. *Id.*

In the Spring of 1998, Ferrero and attorney Ross attended a meeting with Postal Service EEO counselor Arper Tentman. (Tr. 682). Ferrero was hoping for some sort of resolution of the situation. (Tr. 682). Attorney Ross testified that Tentman began to ask Ferrero questions in a normal voice. Tentman then "got a little gruff with Mrs. Ferrero," according to attorney Ross. (Tr. 227). After attorney Ross told Tentman to change his tone of voice or they would leave, Tentman became much more polite. (Tr. 227).

During the meeting, Tentman instructed Ferrero to fill out an affidavit despite the fact that she had already submitted a multi-paged chronology. (Tr. 682). Attorney Ross suggested that they xerox the chronology and have Ferrero sign it, effectively making it her affidavit. Yet, Tentman rejected this idea and required Ferrero to physically rewrite the statement, a task that took her a couple of hours. (Tr. 682–83). During this meeting, Conover was also in the area and Ferrero overheard Conover call her a liar. (Tr. 684). Ferrero testified that if this meeting resulted in an offer of a position, she would have attempted to work. (Tr. 757). She further testified, however, that she was still shaky, did not feel well, and had no intention of returning to work at that time. (Tr. 758).

By August 1998, the Postal Service's EEO office had completed its internal processing of Ferrero's Complaint, and she requested a hearing before an Administrative Law Judge ("ALJ") with the United States Equal Employment Opportunity Commission. (Plaintiff's Exh. 17; Defendant's Exh. 37 at 2).[3]

Defendant never disciplined Conover for his work conduct because, according to Defendant, there was no reason. (Doc. # 104 at ¶ 12).

## G. *Termination of Ferrero's Employment*

On February 16, 1999, Conover sent a letter to Ferrero. (Plaintiff's Exh. 20). Conover did not write this letter; he received it from the Postal Service Office in Cincinnati. (Tr. 592). Thomas Lang, the Postal Service's Manager of Human Resources, Cincinnati District,[4] testified about this letter, stating "We call it in house and options letter. It is providing just an outline of what options are available to employees predicated on specific circumstances surrounding their reasons for being unavailable for duty.... [I]t would go out if a person abandons a job. It would go out if a person was injured and recovers and the medical documentation states they can work, however, they continue to say ... they need light duty or they don't show up for work." (Tr. 153).

Although Conover signed the February 1999 letter, it was prepared by Vincent Catalano at Conover's request. (Tr. 853). Catalano was a labor relations specialist for the Postal Service's Cincinnati Division. (Tr. 850). Catalano understood that Ferrero had indicated to the Postal Service that she was totally disabled. (Tr. 855).

The letter gave Ferrero the following options: (1) returning to full-time work

---

3. A dispute exists regarding whether the EEOC issued a final decision concerning Plaintiff's EEO Complaint. *Compare* Doc. # 98, ¶ 45 *with* Doc. # 104, ¶ 45. This dispute is insignificant because the pertinent pre-requisite to filing this case has been met. *Compare* Doc. # 98 at ¶ 46 *with* Doc. # 104 at ¶ 46.

4. This District includes the Cedarville Post Office.

with no restrictions, (2) accepting disability retirement, (3) resigning, or (4) resigning with deferred annuity. (Defendant's Exh. 29). In addition, the letter also informed Ferrero of the Postal Service's willingness to "fully explore all options with [her] in order to assist [her] in making a decision." *Id.* It further stated that Ferrero could obtain more information and counseling by meeting with Richard Broyles of the Postal Service's Personnel Office. *Id.*

Catalano testified that this general letter was sent to employees prior to termination outlining the options that might be available to them, even though none of the options might be available. He explained, "Everybody has got different circumstances, so we make it a general type of letter where they may be entitled to one of these [options], some of them or none of them. We don't know. We just provide it to them as an option prior to terminating them basically." (Tr, 854–55).

On March 8, 1999, Ferrero and attorney Ross met with Richard Broyles for four or five minutes. (Tr. 216, 761). At that time, Ferrero still did not feel well enough to return to work. (Tr. 758–59). During the meeting, Broyles never said anything about the possibility of Ferrero returning to work with limitations. (Tr. 760–61). Instead, Broyles told Ferrero and attorney Ross that none of the four options set forth in the February 1999 letter were available to her. (Tr. 216; Defendant's Exh. 38 at ¶ 8). Attorney Ross "was a little bewildered why they had gone to all of that trouble to bring us over there . . . , because they didn't have anything to say to us so we left." (Tr. 217).

Conover had not been notified about Ferrero's meeting with Broyles. (Tr. 417). Conover never spoke with Broyles about Ferrero. (Tr. 417).

By April 1999, Conover believed that Ferrero had not responded to the February 16, 1999 letter. (Tr. 417). Conse-quently, on April 5, 1999, Conover wrote to the Postal Service's Labor Relations department, Cincinnati Division requesting "concurrence in administratively separating . . . Ferrero . . . from the United States Postal Service." (Defendant's Exh. 30). Conover explained as follows:

> She has not been in to work or correspond [sic] with me in any way since August 11, 1997.

> Enclosed are some documents to consider and Labor Relations may be able to show you more, as I have talked to a couple of people in that Office.

A handwritten note on Conover's Memo indicates its author (probably Todd Reilly, the person to whom Conover sent the letter) concurred in Conover's decision to terminate her employment, "if Labor is in Agreement?" (Defendant's Exh. 30). Labor was in agreement, and on April 15, 1999, Conover sent Ferrero a letter informing her of the Postal Service's decision to administratively separate her, effective May 29, 1999. (Plaintiff's Exh. 23).

"Labor," it turns out, was Catalano. Catalano drafted the April 15, 1999 letter for Conover to sign and send to Ferrero. (Tr. 856; *see* Plaintiff's Exh. 23). When drafting this letter Conover incorrectly assumed that Ferrero had not responded to his February 16, 1999 letter. (Tr. 457). Conover testified at trial that this was one reason he sent the April 15, 1999 administrative separation letter. (Tr. 420). Catalano understood at this time that Ferrero had "failed to exercise any of the options or that none of the options fit her particular case." (Tr. 857). Yet, Catalano also testified that he merely played an advisory role in the final decision to terminate Ferrero's employment. (Tr. 857). He testified, "I was not the deciding official. I was not the post master. As the labor relations representative, we are only there to provide advice. . . . It's up to them

whether or not they will want to follow through on it." (Tr. 857). This testimony and Conover's position as Postmaster with supervisory authority over Ferrero constitutes proof by a preponderance of the evidence that Conover had the authority to terminate Ferrero's employment and that Conover made the final decision to terminate Ferrero's employment.

On April 27, 1999, attorney Ross sent a letter to Catalano explaining that Conover was again harassing Ferrero by sending her a letter containing four options when no options were actually available to her and by then sending her a letter terminating her employment. (Plaintiff's Exh. 24). Ross stated, "This is just another form of harassment on the part of Mr. Conover. Apparently, he is permitted to act with impunity and without any supervision. He knows full well there are two actions pending." *Id.*

Conover responded by letter on April 30, 1999 stating, "In discussing this matter with the Personnel Office, Ms. Ferrero has not elected to pursue any possible options made available by management." (Defendant's Exh. 33). Conover had obviously failed to grasp the point that Ferrero had not in fact been offered any available options by management. This statement by Catalano in his letter of April 30, 1999 conflicts with the portion of his trial testimony, where he stated that he understood Ferrero had "failed to exercise any of the options *or that none of the option fit her particular case.*" (Tr. 857 (emphasis added)). In fact, when he prepared the termination letter in April 1999, Catalano knew that she had failed to exercise any of the options given by management, not alternatively that the options did not fit her particular case.

Ferrero testified at trial that she remained unable to work for the Postal Service as a rural mail carrier and that she would be unable to work for the Postal Service either with or without restrictions, because she gets "halfway ill" when she goes to any post office. (Tr. 749–50). She further explained that she "can't lift" and that only on some days she can reach above her shoulder with her left arm. (Tr. 750).

## III.  ANALYSIS

### A.  *The Rehabilitation Act and Ferrero's Claims*

The Rehabilitation Act prohibits the Postal Service from discriminating against its employees. 29 U.S.C.A. § 794(a).[5]

Ferrero claims that the Postal Service, through Defendant Postmaster General ("Defendant"), violated her rights under the Rehabilitation Act in the following ways:

1.  Retaliating against her by terminating her employment and by engaging in numerous acts of harassment;

2.  Terminating her employment because she is under a "disability";

3.  Failing to accommodate her disability and failing to engage in an interactive process concerning what accommodations could and must be provided; and

4.  Discriminating against her by subjecting her to a hostile or abusive work environment.

Ferrero also claims that the Postal Service violated her rights under the FMLA in numerous ways.

---

**5.**  The Rehabilitation Act states in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in section [705(20)] of this title, shall, solely

by reason of her or his disability, be ... subjected to discrimination ... by the United States Postal Service.

29  U.S.C.A. § 794(a) (footnote omitted).

## B. Retaliation—Applicable Standards and Prima Facie Case

### 1.

### The Rehabilitation Act and McDonnell Douglas/Burdine [6]

The Rehabilitation Act prohibits the Postal Service from retaliating against an employee because he or she engaged in a statutorily protected activity. *Gribcheck v. Runyon,* 245 F.3d 547, 550 (6th Cir.2001). Ferrero need not show that she is under a "disability" to maintain a claim under the Rehabilitation Act based on the theory that her employer retaliated against her because she engaged in legally protected activities. *Davis v. Flexman,* 109 F.Supp.2d 776, 801–02 (S.D.Ohio 1999)(Rice, C.J.); *see Barrett v. Lucent Technologies, Inc.,* 36 Fed.Appx. 835, 840 (6th Cir.2002).

■ Ferrero did not present direct evidence at trial to prove her retaliation claims. She may, however, rely on circumstantial evidence. *See Kline v. Tennessee Valley Authority,* 128 F.3d 337, 348 (6th Cir.1997). Thus, the *McDonnell Douglas/Burdine* [7] analytical framework applies, and under this framework, Ferrero must first establish a *prima facie* case of retaliation. *See Gribcheck,* 245 F.3d at 550. To do so she must produce evidence supporting four elements:

1. She engaged in a legally protected activity;

2. Her employer knew about her protected activity;

3. Her employer took an adverse employment action or a supervisor subjected her to severe or pervasive retaliatory harassment; and

4. Her legally protected activity and her employer's adverse employment action were causally connected.

*Gribcheck,* 245 F.3d at 550; *see Gaines v. Runyon,* 107 F.3d 1171, 1175 (6th Cir. 1997).

If Ferrero establishes her *prima facie* case of retaliation, the burden of production then shifts to her employer "to articulate some legitimate, nondiscriminatory [i.e., non-retaliatory] reason" for its actions. *See Gribcheck,* 245 F.3d at 550 (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). If her employer satisfies its burden of production, Ferrero must prove by a preponderance of the evidence that the asserted reasons for the adverse employment action were a pretext for retaliation. *See Gribcheck,* 245 F.3d at 550.

The ultimate burden of persuasion to prove retaliation remains with Ferrero at all times. *See Gribcheck,* 245 F.3d at 550.

### 2.

### Defendant's Contentions and EEOC v. Avery Dennison Corp.

■ The parties each present proposed findings of fact and conclusions of law concerning the issue of whether Ferrero has established a *prima facie* case of retaliation. (Doc. # 120 at ¶¶ 20–28); (Doc. # 124 at 11–12). Most significantly, while Ferrero further presents finding and conclusions drawn from her burden shifting analysis, Defendant rests his opposition to Ferrero's retaliation claim only on the contentions that Ferrero has not proven the elements of a *prima facie* case of retaliation. *See* Doc. # 124 at 11–12. However,

---

6. Standards used to determine whether an employer has discriminated against an employee in violation of the Americans with Disabilities Act of 1990 are applicable in Rehabilitation Act cases. *See* 29 U.S.C. § 791(g).

7. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Defendant's approach is contrary to *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860–61 (6th Cir.1997).

In *Avery Dennison*, the Court of Appeals held that where, as in the instant case, the parties fully presented during a trial to the bench, the District Court erred by dismissing the case based on the post-trial conclusion that the EEOC had failed to establish a *prima facie* case of discrimination. The Court of Appeals held, "it is inappropriate for a court to resolve a discrimination case on grounds that a *prima facie* case had not been made, after the case has been fully tried on the merits." *Avery Dennison*, 104 F.3d at 860 (discussing *United States Postal Serv. Bd. v. Aikens*, 460 U.S. 711, 717, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). The issue of whether a plaintiff has shown a *prima facie* case "is a preliminary matter which cannot be revisited at a later time." *Avery Dennison*, 104 F.3d at 861. The Court explained:

> The proper inquiry following the presentation of all evidence in a Title VII case is whether plaintiff has proven its case by a preponderance under the *McDonnell Douglas–Burdine–St. Mary's* [8] burden shifting framework. At this stage in the case, the relevant inquiry should not be whether plaintiff has proven its *prima facie* case.

104 F.3d at 862. The Court of Appeals further explained, "By allowing the case to proceed to a trial on the merits, the district court implicitly acknowledged the existence of Plaintiff's *prima facie* case. Defendant would only have been entitled to judgment if Plaintiffs had failed to carry their burden of proving the ultimate issue of discrimination." 104 F.3d at 863.

In the instant case, because the parties have fully presented their evidence during a trial to the bench on the merits of Ferrero's retaliation claims, Defendant may not prevail solely by challenging her *prima facie* case. *See Avery Dennison Corp.*, 104 F.3d at 861. This Court must instead conduct the burden shifting analysis and decide the ultimate issue of whether Ferrero has met her burden of proving retaliation by a preponderance of the admissible evidence. *See Avery Dennison*, 104 F.3d at 862–63.

*Avery Dennison*, moreover, presents the same procedural background as Ferrero's case: in both cases no pre-trial ruling was made on the merits of the employer's challenge to the employee's *prima facie* case.[9] *See Avery Dennison*, 104 F.3d at 859. This mattered little in *Avery Dennison*: "The fact that the [district] court was faced with the *prima facie* question at the summary judgment stage and then allowed the case to go to trial, could be construed as a tacit acknowledgment of Plaintiffs' *prima facie* case. Proof of the *prima facie* case is only the first step in the proof of a Title VII claim." 104 F.3d at 861. Consequently, regardless of whether in Ferrero's case the Court has tacitly acknowledged the existence of a *prima facie* case, the entire burden shifting analysis must be performed, and the ultimate issue of whether Ferrero has met her burden of proving retaliation must be resolved. *See Avery Dennison*, 104 F.3d at 861–63.

This, however, does not mean that Ferrero is relieved of her burden of proving a *prima facie* case by a preponderance of admissible evidence. She must prove such a case. *See Avery Dennison*, 104 F.3d at 862. Her burden here, however, must not be confused with her ultimate burden of proving that retaliation has occurred. *See*

---

8. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

9. During Ferrero's trial this Court took under advisement Defendant's Rule 50 Motion for Judgment as a Matter of Law. (Tr. 849).

*id.* The burden to prove a *prima facie* case of discrimination or retaliation—while measured under the preponderance of evidence standard—has been described as "low," *Gribcheck,* 245 F.3d at 551, and "not onerous, but one easily met," *DiCarlo v. Potter,* 358 F.3d 408, 420 (6th Cir.2004) (citation omitted), and "minimal," *Avery Dennison,* 104 F.3d at 861. This standard is met with less evidence than is necessary to prove the ultimate question of discrimination or retaliation. *Avery Dennison,* 104 F.3d at 861.

How is this low evidentiary hurdle reconciled with the preponderance of evidence standard, which undoubtedly applies at the *prima facie* stage? *Avery Dennison* answers this question by instructing that at the *prima facie* stage, even after all the evidence has been presented in a trial on the merits, the Court sitting as fact-finder must credit the admissible evidence favorable to the plaintiff and draw all reasonable inferences in his or her favor. 104 F.3d at 861. If a *prima facie* case emerges from a preponderance of evidence viewed in this manner, then the plaintiff's burden is met even if a finder of fact could credit other contrary evidence and draw other contrary reasonable inferences. This analytical approach maintains the traditional role of *prima facie* proof—creating a rebuttable presumption of discrimination or retaliation—and distinguishes the burden of proving, by a preponderance of admissible evidence, a *prima facie* discrimination or retaliation from the ultimate question of whether the plaintiff has proven discrimination or retaliation by a pre-

ponderance of the admissible evidence. *See Avery Dennison,* 104 F.3d at 861–62. Indeed, not maintaining this distinction was reversible error in *Avery Dennison,* 104 F.3d at 861–63.

Accordingly, Defendant has erred by focusing on Ferrero's failure to prove a *prima facie* case of retaliation as the sole ground for defeating her claim. *See* Doc. # 124 at 11–12. Instead, the analysis set forth above applies, and the Court therefore considers whether Ferrero has met her burden of proving a *prima facie* case of retaliation.

### 3.
### *Ferrero's Prima Facie Case*

■ Ferrero has met her minimal burden of proving a *prima facie* case of retaliation by a preponderance of the admissible evidence.

Ferrero's testimony and the documents admitted into evidence if credited show that she followed the Postal Service's procedures for challenging Conover's conduct by seeking informal counseling from the Postal Service's EEO office, by submitting to the EEO office a chronology of her allegations, by attending mediation, by filing a Complaint with the EEO office, by meeting with EEO counselor Arper Tentman, and by requesting and attending a hearing before an ALJ with the Equal Employment Opportunity Commission. *See supra,* § II(F). This constituted protected activity under the Rehabilitation Act, and Ferrero has consequently established the first element of her *prima facie* case.[10] *See DiCarlo,* 358 F.3d at 420–22.

---

**10.** Ferrero asserts that she engaged in numerous other protected activities by asserting, "Ms. Ferrero engaged in protected activity. This included light duty, health provider absences, sick leave, providing medical information...." (Doc. 120 at 24). She, however, does not cite to case law holding that the Rehabilitation Act protects these activities when an employee is not under a "disability."

*See Sullivan v. River Valley School Dist.,* 197 F.3d 804, 814 (6th Cir.1999)(activity must be protected means of opposing employer's unlawful activity); *cf. Johnson v. University of Cincinnati,* 215 F.3d 561, 579–80 (6th Cir.2000)(employee must have reasonable and good faith belief that he is opposing an act or practice that violated ADA). This is significant here because, as discussed later, Ferrero

The evidence further established that Conover knew about Ferrero's protected activities, that he wrote a chronology of the events at issue and submitted it to the EEO, and that he attended mediation in November 1997. Vincent Catalano, author of Ferrero's termination letter, knew about her act of filing a charge with the EEOC, because Catalano attended the EEOC's hearing held before an ALJ. (Defendant's Exh. 36 at 5). In addition, Ferrero's attorney wrote to Catalono in April 1999 reporting Conover's harassment. (Doc. # 32). Catalano, moreover, wrote and sent Ferrero an options letter in February 1999, at Conover's request. *See supra,* § II(G); *see also* Defendant's Exh. 29. Ferrero has thus established the second element of her *prima facie* case.

Defendant's act of terminating Ferrero's employment on May 29, 1999 constituted the quintessential adverse employment action. *See Rabinovitz v. Pena,* 89 F.3d 482, 489 (7th Cir.1996); *see also* Defendant's Exh. 31. Although rather than describing the end of Ferrero's employment as a termination, Defendant describes it as a "separation" or her employment status as being "administratively separated." (Defendant's Exhs. 29, 31). These, however, are merely euphemisms for termination, because the record does not contain any evidence indicating that Ferrero had the right to return to work after May 29, 1999. Indeed, Defendant's letter of April 15, 1999 did not provide her with the option of returning to work by May 29, 1999. It simply set May 29, 1999 as her last day of employment. (Defendant's Exh. 31). Consequently, Ferrero has shown the third element of her *prima facie* case.

Ferrero has shown the final element of her *prima facie* case—causation—through evidence indicating that after she first complained about Conover's conduct to the Postal Service's EEO office, Defendant engaged in a pattern of retaliatory conduct through its mishandling of her complaints and its negative conduct towards her. Defendant began this pattern by holding merely a single brief meaningless mediation session in November 1997. Although Conover attended this session, he made no serious attempt to resolve Ferrero's Complaints but instead acted angrily and leered at Ferrero. Attorney Ross, who represented Ferrero during the mediation, testified at trial that Conover appeared "very agitated. And, of course, always leered at Ms. Ferrero." *Supra,* § II(F). This testimony is credible as it is consistent with Conover's management style and with his attempts to intimidate Ferrero during July–August 1999. *See infra,* § III(B)(5). Defendant also failed to reschedule the mediation even though the issue that had prevented it from going forward was Conover's desire to have a Union representative present—an issue that should have been easily resolved and should not have prevented other mediation efforts from occurring.

A pattern of retaliation began to emerge in the Spring of 1998 when Ferrero met with EEO counselor Tentman. Rather than attempting to find a resolution, Tentman became a little gruff with Ferrero, and he required her to write another affidavit even though she had given him her previously written chronology of the events at issue. Tentman, moreover, rejected attorney Ross' reasonable suggestion that Ferrero's previously written

---

does not suffer from a "disability" within the meaning of the Rehabilitation Act. *See infra,* § III(C)(2). Absent a "disability," the Rehabilitation Act did not create for Ferrero the right to, or protection from retaliation for,

"light duty, sick leave, health provider absences, or providing medical information." *See* 29 U.S.C. § 794(a) (discrimination protection provided only to an "otherwise qualified individual with a disability....").

chronology could be photocopied, then signed by her, effectively making it a declaration or an affidavit. By rejecting this reasonable suggestion and requiring Ferrero to rewrite her lengthy chronology and by not in any way indicating an intent to resolve her complaints about Conover, Tentman revealed an antagonism towards her complaints. This antagonism reveals an emerging pattern of retaliation against Ferrero, a pattern which establishes a causal connection between her protected EEO activities and her eventual termination.

In addition, Defendant had by this time required Ferrero to, in essence, jump through two hoops by requiring her to attend the meaningless mediation in November 1997 without rescheduling it, and by subjecting her to Tentman's antagonism towards her complaints about Conover in the Spring of 1998. Without any further attempt to resolve her complaints, Defendant permitted Conover to send her the February 1999 letter addressing four options available to her concerning her continued employment. (Plaintiff's Exh. 20). If viewed in isolation from the other evidence, this letter on its face contains no hint of retaliation. However, from Ferrero's perspective, Defendant had completely failed to address her Complaints about Conover's conduct, even though sixteen months had passed from the time she had first reported her complaints to the EEO office. The fact, moreover, that Defendant permitted Conover to sign and send this letter showed an insensitivity towards her complaints that is consistent with the pattern of retaliation that had emerged by that time.

Perhaps most significantly, this letter contained bogus options. Ferrero learned this when Defendant required her to go through another meaningless meeting. This occurred when she attempted to obtain further information and employment counseling from Richard Broyles in the Postal Service's personnel office. However, when Ferrero and attorney Ross met with Broyles, he informed her that none of the four options offered in the February 1999 letter were available to her. *Supra,* § II(G). Defendant notified Ferrero soon thereafter that she was being administratively separated effective May 29, 1999.

It should be again emphasized that at this point in the *McDonnell Douglas/Burdine* analysis, Ferrero's burden to show causation is "minimal." *Avery Dennison,* 104 F.3d at 861. Thus, while the evidence if credited differently than above may show innocent, non-retaliatory reasons for Defendant's mishandling of Ferrero's complaints about Conover, at the *prima facie* stage the admissible evidence credited as above reveals a pattern of retaliatory acts against Ferrero beginning only after she submitted her EEO complaint and continuing until the termination of her employment. Indeed, it can be reasonably inferred from the evidence that rather than engaging in at least one meaningful attempt to resolve her complaints about Conover, Defendant engaged in carrot-and-stick responses to her complaints, with an emphasis on the "stick" particularly during Tentman's meeting in the Spring of 1998. On three separate occasions, with no intervening reconciliation efforts, Defendant set Ferrero up to believe it was attempting to resolve her complaints about Conover's misconduct. Defendant then disappointed Ferrero by allowing Conover to reject mediation in November 1997 with no further mediation efforts, by subjecting her to Tentman's antagonism towards her complaints in the Spring of 1998, and by offering her four bogus options regarding the terms of her employment in February 1999. Ferrero has therefore shown a causal connection between her EEO complaints and the termination of her employment.

Defendant contends that Ferrero's attempt to show causation fails due to the lack of temporal proximity sufficient to create an inference of causation. This contention lacks merit in light of the evidence which if credited demonstrates a pattern of retaliation after Ferrero filed her EEO complaint. This is so despite the fact that a large amount of time passed between the date of Ferrero's complaints to Defendant's EEO Office (September 1997) and her EEOC charge (December 1997) and the date of her termination. The record contains sufficient evidence to create a reasonable inference that during this time, Defendant engaged in a pattern of retaliatory conduct culminating in Ferrero's termination. This is all Ferrero needs to prove the causation element of her *prima facie* case. Consequently, under the circumstances of this case, Defendant's contention regarding lack of temporal proximity lacks merit.

Accordingly, Ferrero has met her minimal burden of proving a *prima facie* case of discrimination by a preponderance of the admissible evidence.

#### 4.

### *Prima Facie Case and Retaliatory Harassment*

Ferrero further contends that Defendant engaged in retaliatory harassment through the following: (1) the hostile work environment created by Conover; (2) Conover's drive-bys; (3) Conover's hostile conduct at meetings and the affidavit session; (4) the March 8, 1999 meeting; (5) records destruction; (6) inappropriate discovery conduct; (7) the termination of her employment. Ferrero errs here by characterizing as "retaliatory harassment" any act that is arguably "harassment" in the colloquial sense. What Ferrero misses is that to constitute retaliatory harassment in

violation of the Rehabilitation Act, she must not only show that Defendant's act or acts of harassment were perpetrated in retaliation for her legally protected activities, she must also show that the harassment was so severe and pervasive that it altered the conditions of her employment. *See Akers v. Alvey,* 338 F.3d 491, 498 (6th Cir.2003); *see also Crawford v. Medina General Hosp.,* 96 F.3d 830, 834 (6th Cir. 1996).

The allegedly hostile work environment Conover created during July and August 1997 did not constitute retaliatory harassment because at that time Ferrero had not engaged in an activity protected by the Rehabilitation Act. Ferrero's first legally protected activity did not occur until she filed her complaint with Defendant's EEO Office in September 1997. Before this, Conover could not have directed his negative conduct towards Ferrero for the later-occurring legally protected activities. She simply had not engaged in such activities until September 1997.

Accordingly, Ferrero's contention that Conover's retaliatory harassment satisfies the third element of her *prima facie* case lacks merit.

#### 5.

### *Burden Shifting Analysis*

Ferrero's *prima facie* case of retaliation creates a rebuttable presumption that Defendant retaliated against her. *See Burdine,* 450 U.S. at 714, 101 S.Ct. 1425; *see also Avery Dennison,* 104 F.3d at 861. Defendant rebuts this presumption by asserting, through Conover, that Ferrero was terminated because she had not reported to work "in about two years, pretty close to two years." (Doc. #124 at 9, citing Tr. 592[11]). Significantly, the termi-

---

11. This quoted testimony does not appear on page 592 of the transcript, as cited by Defendant's attorney, but it is consistent with Conover's testimony and the letter of February 1999.

nation letter sent to Ferrero also explained that she was being administratively separated due to her "inability to perform the duties of her position." (Plaintiff's Exh. 31). It further explained that she had failed to exercise any of the four options made available to her in February 1999. *Id.* These constitute legitimate non-discriminatory reasons, if true, for Defendant's decision to terminate Ferrero's employment. The burden-shifting analysis thus turns to the issue of whether Ferrero can prove by a preponderance of the admissible evidence that these reasons were a pretext for retaliation. *See DiCarlo*, 358 F.3d at 420; *see also Gribcheck*, 245 F.3d at 550.

■ To establish pretext Ferrero must prove by a preponderance of the admissible evidence (1) that Defendant's asserted reasons for her termination had no basis in fact or (2) that Defendant's asserted reasons did not actually motivate Ferrero's termination or (3) that Defendant's reasons were insufficient to motivate her termination. *See Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994); *see also Gribcheck*, 245 F.3d at 550 (pretext must be proven by preponderance of the evidence).

Ferrero has not proven by a preponderance of the admissible evidence that Defendant's reasons for terminating her employment—she had not been to work in nearly two years—had no basis in fact. It is instead undisputed that Ferrero did not report to work after August 11, 1997, her last day of work. Ferrero has also not shown that she was able to work at the time of her termination. Instead, her testimony reveals that her inability to work continued to the date of trial when she acknowledged that even then she was not able to return to work for the Postal Service. *See supra*, § II(G). Ferrero's inability to return to work for the Postal Service for nearly two years and her inability to work for the Postal Service at the time of her termination constituted sufficient non-retaliatory grounds for terminating her employment. *See Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 378 (6th Cir.2002)(absenteeism is a legitimate nondiscriminatory, nonretaliatory reason); *Diehl v. Tele–Solutions, Inc.*, 57 F.3d 482, 483 (6th Cir.1995)(poor attendance record is a legitimate, nondiscriminatory reason). Accordingly, Ferrero has failed to meet her burden of proving the first and third *Manzer* tests for pretext.

■ Ferrero's proof of pretext therefore rests on the second *Manzer* test. To prove, as required here, that Defendant's asserted reasons did not actually motivate its termination decision, Ferrero must do more than present a *prima facie* case of retaliation; she must produce additional evidence of retaliation. *See Manzer*, 29 F.3d at 1084. "In such cases, the plaintiff attempts to indict the credibility of his [or her] employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination [or retaliation] makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer*, 29 F.3d at 1084.

The Court has reviewed the evidence and carefully considered the chronology of events from the time Ferrero was first injured (July 7, 1997) and the date of her termination (May 29, 1999), to determine if she has met her burden of proving by a preponderance of the admissible evidence that Defendant's asserted reasons for terminating her employment were a pretext for retaliation. For the following reasons, the Court finds that Ferrero has met her burden of proof.

Beginning with Ferrero's credibility, the Court finds that her testimony—particularly concerning Conover's statements and conduct after she was injured on July 7, 1997—was credible. She presented her testimony in a straightforward manner and her demeanor was consistent with truthfulness. Conover's testimony, in contrast, was less than credible in many respects. Although he was candid at times—as in his admission that he thought Ferrero was lying about her injuries—his demeanor was often inconsistent with truthfulness. This was revealed especially during cross examination when Conover often appeared to become very tense and appeared to be struggling to control his anger when questioned about his past statements and conduct concerning Ferrero. In addition, given Conover's very tense demeanor and struggles to control his anger during cross examination, Ferrero's testimony about being intimidated by Conover—who is much taller than Ferrero—is likewise credible.

Ferrero's testimony concerning the three meetings at issue (November 1997, Spring 1998, and March 1999) was in large part corroborated by attorney Ross' testimony. Attorney Ross was a credible witness. His demeanor was both professional and consistent with truthfulness. He is not an attorney of record in this case, and as a result, he held no direct financial interest in the outcome of this case. He simply had nothing to gain by exaggerating or presenting untruthful testimony, while he had much to lose in terms of his professional reputation by testifying in a less than truthful manner. The substance of his testimony was significant since it confirmed that Conover was angry and that he leered at Ferrero during the November 1997 mediation. Attorney Ross also corroborated Ferrero's testimony about Tentman's antagonism during the Spring 1998 meeting and Broyles' conduct during the March 1999 meeting.

Ferrero's testimony about Conover's treatment of her during July and August 1997 after she reported her injuries was indirectly supported by Zeman's testimony. Although Zeman did not testify that she saw Conover mistreat Ferrero, Zeman testified that Conover tried to intimidate her after she (Zeman) had reported an injury. Zeman further testified that she saw Conover become irritated and heard him refer to Nancy Hatten as a "bitch" when she called in sick. This testimony combined with Ferrero's testimony proves by a preponderance of the admissible evidence that Conover's management style doubtlessly included use of intimidation as a method of discouraging employees from taking sick time and from reporting injuries. This further bolsters Ferrero's credibility about Conover's acts of intimidation during July and August 1999. In addition, Zeman corroborated Ferrero's testimony about Conover driving past her home in the fall of 1997.

In light of these credibility conclusions, a preponderance of the admissible evidence establishes that Defendant did not terminate Ferrero because of her absence or inability to work. The admissible evidence instead establishes that it was more likely than not that Conover retaliated against Ferrero for engaging in activities protected by the Rehabilitation Act.

Conover treated Ferrero well before she was injured. He began to mistreat her only after she was injured on July 7, 1997. His treatment of her from then on deteriorated. The intensity of Conover's efforts to intimidate Ferrero during July and August 1997 revealed the severe level of his anger with her. He singled her out as the target of his hostility thereby alienating her from her co-workers. In this way, Conover demonstrated to Ferrero and other employees how they can expect him to react in the event they claim to suffer an

injury. This was the first evidence of Conover's get-even management style.

Conover explained this style on August 7, 1997 when he stated in a very loud voice his plan to retaliate against anyone who crossed him or does something he does not like. *Supra,* § II(B). Paraphrasing Conover, he stated that right or wrong he always "gets even"; that he had done this for thirty-five years; and that getting even with those who crossed him had prevented others from messing with him. *Supra,* § II(B). Conover said this loud enough for Ferrero to hear. Although at trial Conover denied saying this, this part of his testimony was impeached by his prior inconsistent statement during his deposition when he acknowledged that he might have said this. His explanation at trial—that upon further reflection he realized that he did not say this—is inadequate to explain the discrepancy between his deposition and trial testimony. This is particularly so since, as determined above, Conover's testimony was not as credible as Ferrero's testimony. Ferrero's testimony that Conover said this was simply more believable than Conover's denial.

The effect of Conover's statements—that right or wrong he always "gets even"; that he had done this for thirty-five years; and that by getting even with those who crossed him had prevented others from messing with him—is that such statements give rise to the reasonable inference that Conover's management style included retaliation as a crude method of convincing Ferrero and other employees that they should not report injuries.

The next significant fact is seen in Conover's testimony at trial about his belief that Ferrero was lying about the extent of her injuries. From Conover's perspective, Ferrero's lie was at least something he did not like and, given his high level of anger at her in July and August 1997, was an act he believed constituted crossing him.

Hence, his hostile conduct towards Ferrero during this two-month period.

Ferrero therefore established at trial that during July and August 1997 Conover used anger and sarcasm to get even with her for reporting her injuries. This, however, does not by itself lead to the conclusion that Conover retaliated against Ferrero in violation of the Rehabilitation Act, because she did not begin to engage in activities protected by the Rehabilitation Act until September 1997. Yet, the significant point here is that a preponderance of the admissible evidence shows that Conover used "getting even" a management tool to prevent Ferrero and others from crossing him. Such conduct became linked to Ferrero's protected activities beginning in September 1997.

From Conover's perspective, Ferrero again crossed him in September 1997 when she filed a document with the Postal Service's EEO Office seeking informal pre-complaint counseling. There is no doubt that Conover perceived this legally protected activity as "crossing him," because Ferrero focused her complaints on Conover's hostility to her during July and August 1997. Given Conover's get-even management style, Ferrero's act of seeking informal pre-complaint counseling required a retaliatory response. This conclusion is consistent with Conover's get-even management style, and—recalling in particular attorney Ross' testimony—is further supported by Conover's negative and unprofessional retaliatory conduct during the mediation session in November 1997. Conover then continued similar conduct in the Spring of 1998 meeting by calling Ferrero a liar. During this meeting, moreover, EEO counselor Tentman did not seriously attempt to resolve the problems between Conover and Ferrero. He instead required her to spend two hours rewriting her complaint—a needless

896

exercise given attorney Ross' reasonable suggestion that Ferrero could simply sign a photocopy of her previously written complaint, effectively making it a declaration or affidavit. Tentman's antagonistic conduct during this meeting was, unfortunately for all concerned, consistent with Conover's get-even management.

Although at this chronological point (Spring 1998), the record does not contain sufficient evidence beyond a *prima facie* case of retaliation, a pattern of retaliation had begun to occur. The key events to proving Defendant's retaliatory motive occurred in 1999 and culminated in Defendant's decision, through Conover, to terminate Ferrero's employment. These events began in February 1999 with Conover's letter (written by Catalano) to Ferrero describing her four options. These options were bogus. Defendant concedes as much but through Catalano provided an administrative-convenience explanation for offering these bogus options. Catalano explained that each employee presents a different situation, and as a result, Defendant sends this letter with options that may or may not apply. (Tr. 854–55). This explanation rings hollow, particularly in light of the manner Conover had been permitted to get even with Ferrero up to this point and in light of Defendant's failure at any prior time to seriously address Ferrero's complaints about Conover. This reason, moreover, fails to illuminate why Conover or someone with Defendant's EEO office did not or could not have easily learned more about Ferrero's situation.

The explanation that rings true is that the February 1999 letter was Conover's thinly disguised attempt to cover-up his desire to terminate Ferrero's employment, because she had complained about his hostility. This explanation particularly rings true because within only a few weeks after sending this letter, Conover asked the Postal Service's Labor Relations Depart-

ment for its "concurrence in administratively separating ... Ferrero ... from the United States Postal Service." (Defendant Exh. 30). The information he provided to Labor Relations, however, was inaccurate, because he had not attempted to determine if Ferrero had attempted to elect one of the four options. Given that Conover was the final decisionmaker with regard to Ferrero's termination, it fell to him to do more than simply (and incorrectly) assume that Ferrero did not attempt to elect one of the options. If the four options in the February 1999 letter had been legitimate or administratively justified, as Catalano believed, then it would have been reasonable for Conover to check with Broyles— the contact person identified in the letter—to see if in fact Ferrero had attempted to elect one of the options. A simple memo or phone call would have answered this question. This is not what Conover did; he instead merely provided the incorrect information to Labor Relations, thereby obtaining the concurrence he wanted and some semblance of a non-retaliatory justification to fire Ferrero.

If Conover had checked with Broyles, he would have learned that none of the options set forth in the February 1999 letter were available to Ferrero, and that Ferrero and her attorney had met with Broyles to discuss the options. However, these were not facts Conover wanted to learn— indeed, they were insignificant to him. What was most significant to Conover was that Ferrero had crossed him by engaging in legally protected activities, that he had so far managed to avoid interference by his superiors or by the Postal Service's Labor Relations Department or EEO Office. Now he had some semblance—although a wholly pretextual semblance—of a legitimate basis for terminating her employment, which he proceeded to do.

For all these reasons, when the above circumstances concerning Conover's February 1999 letter are viewed together with his get-even management style and his consistent opposition to the efforts to resolve Ferrero's complaints, a preponderance of the evidence establishes that Conover decided to terminate Ferrero's employment, because she had crossed him by engaging in legally protected activities. Because Conover was the final decision-maker with regard to the termination of Ferrero's employment, his retaliatory motive must be attributed to Defendant.

Accordingly, based on the evidence supporting Ferrero's *prima facie* case along with the additional evidence concerning the events and circumstances leading to Ferrero's termination, Ferrero has met her burden of proving by a preponderance of the admissible evidence that Defendant retaliated against her in violation of the Rehabilitation Act.

## C. *Rehabilitation Act—Disability Discrimination*

Ferrero claims that Defendant discriminated against her in violation of the Rehabilitation Act by terminating her employment because she suffers from a disability.

### 1.

#### *Prima Facie Case*

■ To establish a *prima facie* case of disability discrimination, Ferrero must prove the following by a preponderance of the admissible evidence: (1) she suffers from a "disability" within the meaning of the Rehabilitation Act; (2) she is otherwise qualified for her job, with or without a reasonable accommodation; and (3) Defendant discriminated against her solely because of her disability. *Mahon v. Crowell,* 295 F.3d 585, 589 (6th Cir.2002).

### 2.

#### *Ferrero's Disability*

■ Defendant contends that Ferrero cannot show she suffers from a "disability" as defined in the Rehabilitation Act. Ferrero contends that she suffers from a disability, because her physical impairments prevent her (1) from lifting, sometimes no more than five pounds; and (2) from working by eliminating up to fifty-seven percent of the jobs in the economy she can perform, based on the testimony of George Edward Parsons, an occupation specialist.

To make the threshold showing that she suffers from a disability, Ferrero must show she suffers from "a physical or mental impairment that substantially limits one or more of [her] major life activities." 29 U.S.C. § 705(20)(A). The phrases "substantially limits" and "major life activities" are terms of art under the Rehabilitation Act. *Mahon,* 295 F.3d at 590. " 'Substantially limits' is difficult to define, but in the Supreme Court's words, '[s]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.' " *Mahon,* 295 F.3d at 590 (quoting in part *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002)). "Major life activities" are "activities that are of central importance to daily life." *Mahon,* 295 F.3d at 590 (quoting *Williams,* 122 S.Ct. at 691). These activities include, but are not limited to, "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Mahon,* 295 F.3d at 590 (quoting 45 C.F.R. § 84.3(j)(2)(ii)) (other citation omitted). "The Supreme Court has emphasized that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Mahon,* 295 F.3d at 590 (quoting *Williams,* 122 S.Ct. at 691).

Ferrero has not shown that she suffers from a "disability" within the meaning of the Rehabilitation Act. She does not point to any medical evidence of record to support her apparent claim that she is either unable to lift any weight or that she has been unable to lift more than five pounds since September 10, 1997. On September 10, 1997 a physician cleared Ferrero to return to work without lifting restrictions. *See* Defendant's Exh. 6 at 18. Ferrero has not pointed to medical evidence in conflict with this conclusion or to medical evidence showing that her physical condition deteriorated after September 10, 1997. *See* Doc. # 120 at ¶ s 31–38. Indeed, Ferrero testified that she did not return to work at this time because she "couldn't tolerate the environment. It was hostile. I was sick." (Tr. 678). This was a reference to her psychological condition at the time, instead of her physical condition, and confirms that the physician's conclusion that Ferrero could work without physical restrictions is the most probative evidence in the record concerning whether Ferrero's physical injuries limited her ability to lift or work after September 10, 1997.

Ferrero also relies on occupational specialist Parsons' testimony that Ferrero's physical condition probably eliminates about fifty-seven percent of the jobs in the economy. (Tr. 364–65). However, a careful review of Parsons' "fifty-seven percent" testimony reveals that it is entitled to little weight, because it is based on the existence of unproven physical disabilities allegedly suffered by Ferrero after September 10, 1997. *See* Tr. 362–65. Because Ferrero has not pointed to evidence contradicting the physician's conclusion on September 10, 1997—i.e., Ferrero was physically able to return to work without physical restrictions—Parsons's "fifty-seven percent testimony" is insufficient to demonstrate that Ferrero suffers from a physical disability as defined in the Rehabilitation Act.

Ferrero also points to Defendant's statement in the termination letter of April 15, 1997 stating that she had "been unable to work since August 12, 1997." (Plaintiff's Exh. 23). This general statement, however, is not probative of whether Ferrero suffers from a disability; it merely acknowledged her absences and her inability to work without specifying why Defendant believed she had been unable to work. Nothing in the letter discusses her physical or mental health, or mentions a specific impairment or disability that has caused her to be unable to work. *See id.* In addition, her inability to perform the single job of Rural Carrier Associate, as noted in the letter, is inadequate to show as substantial limitation on her ability to work. "To be substantially limited in the major life activity of working . . ., one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Mahon,* 295 F.3d at 591. As a result, Defendant's recognition that Ferrero could not perform the job of Rural Carrier Associate did not amount to an acknowledgment that she is substantially limited in her ability to work. *See id.*

Accordingly, Ferrero has not met her burden of showing that her physical condition included an impairment that substantially impaired her major life functions of lifting or working. She has therefore failed to show that she suffers from a disability as defined in the Rehabilitation Act.

### 3.
### *"Regarded as" under a Disability*

Ferrero contends that Defendant, through the acts or omissions of Conover and other Postal Service personnel, regarded her as being under a disability.

Even though Ferrero is not under a disability, she may still fall into this statutorily protected category if Defendant regarded her as under a disability. *Mahon,*

295 F.3d at 592. The focal point in determining whether Defendant regarded Ferrero as being disabled is not on her physical impairments but instead is Defendant's intent. *See Ross*, 237 F.3d at 706. "To run afoul of the [Rehabilitation Act]..., a covered entity must hold a mistaken belief that a claimant is disabled within the meaning of the [Rehabilitation Act]." *Mahon*, 295 F.3d at 592.

Ferrero has not shown that Defendant held a mistaken belief that she is under a disability. To the contrary, the physician's conclusion on September 10, 1997 informed Defendant that Ferrero was able to return to work without physical restrictions. (Defendant's Exh. 6 at 18).

■ Ferrero contends that Defendant regarded her as under a disability first because Conover testified that:

Q. After the Plaintiff's injury, did you view her as a disabled employee?

A. Yes, absolutely.

(Doc. # 120, quoting Tr. 534). This contention lacks merit because when read in context, Conover's answer shows that he considered Ferrero a "disabled employee" in the sense that she would not be able to work for two to three weeks and that her injuries were temporary, not permanent. (Tr. 533–35). This part of Conover's testimony therefore fails to show that Defendant regarded Ferrero as under a disability.

Ferrero argues that Conover's mocking of her injuries is sufficient to show that he regarded her as under a disability. Ferrero considers her situation with Conover analogous to the plaintiff's situation in *Ross v. Campbell Soup Co.*, 237 F.3d 701, 707 (6th Cir.2001), where the employer/defendant said, "We can't have any more of this back thing." Ferrero's comparison of her situation with the plaintiff's situation in *Ross* is misplaced. The plaintiff in *Ross* presented more probative evidence of the employer's intent concerning the plaintiff's

back injuries in part through a "back memo" characterizing the plaintiff as a "back case" and "a problem person." 237 F.3d at 707. The record in *Ross* also contained a series of events that *arguably* revealed the employer's decision to terminate the plaintiff's employment. These events included, for example, a comment to the plaintiff that "we can't have anymore of this back thing." *Id.* The instant case is distinguished from *Ross* because *Ross* involved an analysis of the evidence in the light most favorable to the plaintiff at the summary-judgment stage. 237 F.3d at 707–08. The Court of Appeals' analysis of the evidence in *Ross* must therefore be understood as construing the evidence in the plaintiff's (the non-moving party's) favor, instead of holding that the statement must lead to the conclusion that the employer regarded the employee as under a disability. *Id.* In addition, the statements at issue in *Ross* occurred during the process that led to the plaintiff's termination. 237 F.3d at 707. In the instant case, Conover's statements to Ferrero did not occur in a similar termination process but occurred nearly over one year before the beginning of termination proceedings in February 1999.

Ferrero next argues, again relying on *Ross*, that Defendant's use of an "all treating physicians" memorandum tends to show that Defendant did at some point regard Ferrero as disabled. This contention lacks merit because an examination of Defendant's "all treating physicians" memorandum shows that it was merely a tool for obtaining medical opinions concerning Ferrero's limitations. *See* Plaintiff's Exh. 4 at 155. It is unlike the memorandum at issue in *Ross*, which contained much more probative information concerning whether the employer regarded the plaintiff as being disabled. 237 F.3d at 707. Defendant's "all treating physician's" memorandum in the instant case did not contain

similarly probative evidence. *See* Plaintiff's Exh. 4 at 155. Indeed, it merely indicated that the employee may have physical limitations, which Defendant could accommodate with certain limited duty positions, such as "one hand work." *Id.* This particular memorandum is, consequently, not probative of whether Defendant regarded Ferrero as under a disability.

Lastly, citing *Henderson v. Ardco, Inc.,* 247 F.3d 645, 647 (6th Cir.2001), Ferrero argues that Defendant's return-to-work offer with no restrictions in the letter of February 16, 1999 involved an impermissible application of a 100% rule,—i.e., a requirement that an employee may not return to work until 100% healed. In *Henderson,* the Court of Appeals recognized that the 100% rule plays a role at the summary-judgment stage "in determining the threshold issue of perceived disability." 247 F.3d at 653. The Court of Appeals stated, "Where the 100% rule is applied to mildly impaired persons to exclude them from a broad class of jobs, it *may* be treating them as disabled even though they are not...." 247 F.3d at 653 (emphasis added). The Court's use of the term "may" indicated that the employer's 100% rule created the possibility that it regarded the employee as disabled. Consequently, *Henderson* does not mandate the conclusion Ferrero seeks to show—that an employer's 100% rule always establishes it regarded the employee as disabled. *See Henderson,* 247 F.3d at 653–54. This reading of *Henderson* is confirmed by the Court of Appeals' decision not to create a per se rule that an employer's use of the 100% rule violates the ADA. *Id.*

Accordingly, Ferrero has not shown that Defendant regarded her as being under a disability, and her *prima facie* case of disability discrimination fails.

### 4.

### *Otherwise Qualified*

█ Ferrero has not shown that she is "otherwise qualified" for her job with Defendant, because her physical and mental impairments prevented her from working for well over one year. *See Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1047 (6th Cir.1998)("An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA."). Throughout the time between her last day of work in August 1997 and the termination of her employment, Ferrero was consistently unable to work with or without restrictions. After receiving the letter of February 16, 1999, Ferrero did not indicate to Defendant that she would be able to return to work either with or without restrictions. Consequently, Ferrero has not shown she was otherwise qualified to perform her job. *See id.* Absent this essential element, Ferrero has not established a *prima facie* case of disability discrimination under the Rehabilitation Act.

### D. *Rehabilitation Act—Denial of Reasonable Accommodation*

### 1.

### *Notice*

Ferrero contends that Defendant violated the Rehabilitation Act by failing to provide her with a reasonable accommodation of her disabilities. Ferrero contends that Dr. Peters requested an accommodation for her in his letter of August 15, 1997 when he wrote, "Patience, understanding, compassion from supervision. Possible employee transfer to another location...." (Doc. #120 at ¶41, quoting Plaintiff's Exh. 4 at 154).

■ To support this claim, Ferrero must show the existence of a *prima facie* case containing the following:

1. She is an individual with a disability;
2. She was qualified for her job;
3. Defendant was aware of her disability;
4. She requested and needed a reasonable accommodation of her disability; and
5. Defendant failed to provide her with a reasonable accommodation.

See *DiCarlo,* 358 F.3d at 419; *see also Gaines,* 107 F.3d at 1175.

■ Ferrero has not established a *prima facie* violation of the Rehabilitation Act, because she has not shown that she is an individual with a disability or that she was otherwise qualified for her job. *Supra,* §§ III(C)(2)-(4). Ferrero has also failed to show that she requested a reasonable accommodation. Although the Rehabilitation Act did not require Ferrero to use any magic or formal words to request a reasonable accommodation, it did require her to convey her request using language sufficient to inform Defendant of her need for a reasonable accommodation. *See Ballard v. Rubin,* 284 F.3d 957, 962 (8th Cir. 2002). The Rehabilitation Act, moreover, squarely placed the burden on Ferrero to request an accommodation. *Gantt,* 143 F.3d at 1046; *see Burns v. Coca–Cola Enterprises, Inc.,* 222 F.3d 247, 259 (6th Cir.2000)(employee bears burden of identifying particular position to which he could be reassigned); *see also Cassidy v. Detroit Edison Co.,* 138 F.3d 629, 633–34 (6th Cir. 1998); *Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1183 (6th Cir. 1996); *Lowery v. Hazelwood School Dist.,* 244 F.3d 654, 660 (8th Cir.2001). "The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Gantt,* 143 F.3d at 1047.

Ferrero acknowledged at trial that after August 11, 1997 she never personally asked Defendant for an accommodation. (Tr. 756). She instead relies on Dr. Peters's note in his August 15, 1997 report.[12] Dr. Peter's note, however, was insufficient to inform Defendant that Ferrero was requesting a reasonable accommodation. Dr. Peters' report was submitted on a form that contained no language that could reasonably be construed as indicating that he was requesting an accommodation on Ferrero's behalf. *See* Plaintiff's Exh. 4 at 154. Instead, Dr. Peters was responding to request for "Recommendations and Prognosis," to which he merely noted, "Patience, understanding, compassion from supervision. Possible employee transfer to another location...." (Plaintiff's Exh. 4 at 154). Although this indicated a possible need to transfer Ferrero, there is nothing in either this note or the entire form even hinting that Ferrero wanted a transfer. *See id.* Without other evidence, such as a request from Ferrero or more specific language somewhere in the record indicating that Ferrero wanted a transfer, the note by itself is simply insufficient to constitute a request for a reasonable accommodation. In addition, Dr. Peters' note failed to identify a particular position to which Ferrero could be assigned and was therefore inadequate by itself to constitute a request for a reasonable accommodation. *See Burns,* 222 F.3d at 259 and n. 7.

Ferrero contends, based on *Schmidt v. Safeway, Inc.,* 864 F.Supp. 991, 997 (D.Or. 1994) that an accommodation request can be made by someone on behalf of the employee. *Schmidt* certainly supports this to some extent by holding that an employer may gain knowledge about an employee's disability through a third par-

---

12. (Doc. # 120 at 8, ¶ 33 and 29, ¶ 41, citing Tr. 30 and Plaintiff's Exh. 5 at 154).

ty. 864 F.Supp. at 997. In the instant case, however, Defendant did not gain such knowledge from Dr. Peters' note, because the note did not inform Defendant that Ferrero was suffering from a disability and it did not otherwise convey information sufficient to alert Defendant that Ferrero was requesting, through Dr. Peters, a transfer or other accommodation. *See* Plaintiff's Exh. 4 at 154.

Accordingly, Ferrero's claim that Defendant failed to provide her with a reasonable accommodation in violation of the Rehabilitation Act lacks merit.

### 2.
#### *Interactive Process*

■ Ferrero maintains that Defendant violated the Rehabilitation Act by failing to engage in its affirmative duty to explore accommodations. This claim lacks merit because Ferrero has not shown that she provided sufficient notice to Defendant of her need or desire for a reasonable accommodation. *Supra,* § III(D)(1). What Defendant knew about Ferrero's condition from September 1997 until the time of her termination was that she was incapable of performing her job duties. Ferrero did nothing during this period to disabuse Defendant of this knowledge. As a result, the Rehabilitation Act did not impose upon Defendant a legal duty to engage in an interactive process for the purpose of exploring whether a reasonable accommodation could be provided. *See Lockard v. General Motors Corp.,* 52 Fed.Appx. 782, 786–87 (6th Cir.2002).

### E. *Disability Harassment*

Relying on *Hall v. Gus Const. Co., Inc.,* 842 F.2d 1010, 1014 (8th Cir.1988), Ferrero contends, "Disability harassment need not involve disability conduct so long as it is directed at an individual because of disability." (Doc. # 120 at 25). This contention lacks merit.

■ The standards applicable to sexual harassment claims under Title VII apply to the other statutory prohibitions against employment discrimination, including claims of disability harassment and retaliatory harassment under the Rehabilitation Act. *See Crawford,* 96 F.3d 830 at 834. Under these standards, to prove disability harassment, Ferrero must show (1) that she was a member of the protected class, i.e., she was under a "disability" as defined in the Rehabilitation Act; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment unreasonably interfered with her work performance and created a hostile work environment; and (5) Defendant is liable for the hostile work environment. *See Blankenship v. Parke Care Centers, Inc.,* 123 F.3d 868, 872 (6th Cir.1997)(Title VII); *see also Crawford.,* 96 F.3d at 834 (Title VII standards apply across employment discrimination contexts).

■ In contrast to Ferrero's contention, a plaintiff seeking to prove disability harassment must establish that he or she is under a "disability" as defined in the Rehabilitation Act. *See Handshoe v. Mercy Medical Center,* 34 Fed.Appx. 441, 448 (6th Cir.2002)(citing *Parke Care Centers,* 123 F.3d at 872)(other citation omitted); *see also Trepka v. Bd. of Educ. of Cleveland City School Dist.,* 28 Fed.Appx. 455, 461 (6th Cir.2002)(citing *Parke Care Centers,* 123 F.3d at 872)(other citation omitted). Ferrero's reliance on *Hall v. Gus Construction Co., Inc.* to demonstrate otherwise is misplaced. The Eighth Circuit Court of Appeals in *Hall* did not hold that a plaintiff seeking to prove disability harassment need not prove she was under a "disability." The Court of Appeals in *Hall* held that to establish a sexually hostile work environment, a plaintiff need not show that the predicate acts were sexual

but must show that predicate acts would not have occurred but for the fact that the plaintiffs were women, i.e., members of a class of employees (women, in *Hall*) protected by Title VII. 842 F.2d at 1014. Since *Hall* did not involve a disability harassment claim, it did not directly resolve the issue Ferrero raises—whether a claim of disability harassment must include proof of a disability.

Ferrero reads *Hall* accurately to the extent she contends that, in general, predicate acts of harassment need not be directed at an individual's disability to support a claim of disability harassment. *Cf. Hall*, 842 F.2d at 1014. Harassment can take many forms, unfortunately limited only by the harasser's imagination. Such acts could include verbal teasing with no mention of a victim's disability or vandalism of an employee's work station or property with no overt theme at all. Under *Hall*, then, hostile verbal comments towards Ferrero could constitute predicate acts of harassment even if the comments did not directly mention her alleged disability. *Id.*

However, *Hall* also requires that Ferrero be among the statutorily protected class of persons under a disability. This requirement exists in *Hall* through its recognition that a victim of sexual harassment must do more than point to harassing acts; she must also show that the harassment would not have occurred but for her sex, i.e., her membership in the statutorily protected class of employees. *Hall*, 842 F.2d at 1014. Consequently, instead of supporting Ferrero's position, *Hall* requires Ferrero to show she was a member of the statutorily protected class of employees who are under a "disability" and that the harassment she suffered would not have occurred but for the fact of her disability. *See Hall*, 842 F.2d at 1014. This she has not done, because she has not shown that she was under a "disability" within the

meaning of the Rehabilitation Act. *Supra*, § III(C)(2)-(3).

Accordingly, because Ferrero was not under a "disability" within the meaning of the Rehabilitation Act, her claim of disability harassment fails.

### F. FMLA—Retaliatory Harassment

#### 1.

#### The Parties' Contentions

■ Ferrero claims that the Postal Service violated her rights under the FMLA by engaging in numerous acts of retaliatory harassment including the following:

1. Conover's conversation with the Union Steward concerning Ferrero's medical information;

2. The attempt on July 18, 1997 to convince Dr. Peters to get him to change his accommodation request from leave to telephone work;

3. Conover's drive-bys of Ferrero's home;

4. Conover's conduct at the November 1997 meeting;

5. The Postal Service's handling of the March 1999 meeting;

6. The termination of her employment;

7. Conover's act of removing Ferrero's personnel file and destruction of comparable employees' files; and

8. The Postal Service's conduct in providing false discovery information in order to defeat Ferrero's FMLA claims.

(Doc. # 120 at 42–43).

The Postal Service contends that it did not violate the FMLA because Ferrero was not eligible for FMLA benefits in 1997, and as a result, she held no rights under the FMLA. The Postal Service maintains that Ferrero did not work enough hours to gain eligibility status un-

der the FMLA. The Postal Service further maintains that Ferrero never requested FMLA leave and never opposed a purported violation of the FMLA. These contentions are well taken.

"[T]he FMLA entitles 'eligible employees' to take up to twelve weeks of unpaid leave in any twelve-month period for qualifying medical or family reasons. *See* 29 U.S.C. § 2612(a)(1). The FMLA ensures that the statutorily-protected employeés will be restored to the same or an equivalent position upon returning to work. *See* 29 U.S.C. § 2614(a)(1)." *Mitchell v. Chapman*, 343 F.3d 811, 826 (6th Cir.2003). "Eligible employees are those who have been employed for a minimum of twelve months by the employer from whom relief is requested and who have performed the threshold 1250 hours of service." *Sims*, 219 F.3d at 561 (citing 29 U.S.C. § 2611(2)(A)(i)).

The Postal Service employed Ferrero for more than twelve months and she therefore meets the first FMLA eligibility requirement. The Postal Service, however, has proferred relevant, authentic, and admissible evidence sufficient to establish that Ferrero had not worked a total of 1250 hours during the twelve months immediately before either the date of her injury (July 7, 1997) or the date she needed to begin FMLA leave (August 11, 1997). The key document (Defendant's Exh. 44) upon which this conclusion is based contains a list of the hours Ferrero worked during the pertinent twelve-month period. The hours Ferrero worked, as established by this list, does not total 1250.

Thomas Lang, the Postal Service's Manager of Human Resources (Cincinnati Division), testified during trial that the list shows the number of hours Ferrero worked during each pay period. (Tr. 158–59). He further explained that at his request one of his staff members and a member of the Postal Service's finance department "pulled information ... from out personnel data site in Minnesota and pulled the payroll journals. Added the payroll journals together for that period July 20, 1996 through August 1 of 1997." (Tr. 157–58). Lang testified that based on the data gained in this way, he learned that Ferrero's total work hours, with adjustments, equaled 1,225.29. (Tr. 157, 160). Because Ferrero worked less than the total number of hours required to become an eligible employee under the FMLA, her FMLA claim fails. *See Sims*, 219 F.3d at 561 (citing 29 U.S.C. § 2611(2)(A)(i)). This, of course, is so only if the list is admitted into evidence.

Ferrero objected to the admission of Defendant's Exhibit 44 and moved to strike it as well as related testimony based on Defendant's failure to produce it before trial in response to her discovery requests.

The Court finds that the relevant, indeed dispositive, nature of the information contained in this document is not substantially outweighed by any prejudice in its admission or the Postal Service's delay causes Ferrero. *See* Fed.R.Evid. 401–03. The prejudice this document causes Ferrero stems from its extremely late production rather than from the nature of the information it contains. The information, moreover, within the document is not inflammatory and does not confuse the issue of whether Ferrero is an eligible employee under the FMLA. The information instead clarifies that she is not an eligible employee under the FMLA. In addition, the prejudice to Ferrero—her attorney's time in preparing an FMLA claim without this crucial evidence—is eliminated by the monetary sanction upon the Postal Service, discussed below, *infra*, § III(H), which includes the attorney fees she incurred in preparing her FMLA claims. Accordingly, Ferrero's objections to the admission of Defendant's Exhibit 44 are overruled, her

Motion to Strike this Exhibit is denied, and Defendant's Exhibit 44 is admitted into evidence.

Ferrero's FMLA claim also fails because she did not notify the Postal Service that she needed FMLA leave. "[N]othing in the statute places a duty on an employer to affirmatively grant leave without such a request or notice by the employee." *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir.1998). Ferrero asserts that she "did this" but she fails to cite to evidence of record or provide argument in support. (Doc. # 120 at 39). The fact that Ferrero was on leave was not by itself sufficient notice that she at any point had decided to designate it as FMLA leave.

Accordingly, Ferrero's FMLA claims lack merit.

### G. Constructive Discharge, Back Pay, Front Pay

#### 1.

#### Applicable Remedies

The Rehabilitation Act provides the remedy of back pay damages (lost wages and benefits) from the date of the employee's discriminatory or retaliatory termination to the date of judgment. *See* 29 U.S.C. § 794a(a)(1); *see also Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1168 (6th Cir.1996). The Rehabilitation Act also provides for an award of future or front pay damages, in lieu of reinstatement or instatement to a different position, from the date of judgment forward. *See* 29 U.S.C. § 794a(a)(1); *see also Lussier v. Runyon*, 50 F.3d 1103, 1107 (1st Cir.1995).

#### 2.

#### Constructive Discharge and Back Pay

Ferrero contends that her termination occurred in August 1997 when she was constructively discharged due to Conover's harassment. She therefore calculates her back pay damages from this point forward, seeking back pay damages totaling $263,635.00. Ferrero also seeks a total award of front pay damages equaling $911,520.00.

Constructive discharge occurs when an employer "deliberately creates intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit. To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir.1999). The employer's intent can be inferred from evidence indicating that "quitting was a foreseeable consequence of the employer's actions." *KUKA Welding*, 171 F.3d at 1080.

Ferrero's proof that Defendant retaliated against her in violation of the Rehabilitation Act does not by itself establish that she was constructively discharged. *See KUKA Welding*, 171 F.3d at 1080 (Title VII). She must show that her working conditions were "so difficult or unpleasant that a reasonable person in ... [her] shoes would have felt compelled to resign.'" *Yates v. Avco Corp.*, 819 F.2d 630, 636–37 (6th Cir.1987)(quoting in part *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982)).

Although Ferrero's testimony and other evidence shows that Conover harassed her during July and August 1997, she has not presented sufficient evidence to show Defendant, through Conover, intended to retaliate against her by terminating her employment at that time. Indeed, the evidence instead shows that his negative conduct toward her during this time arose from his belief, albeit an erroneous belief, that she was lying about the extent of her injuries. Conover's negative conduct was doubtlessly a crude, poorly thought out, and heavy-handed approach to managing the Postal Service employees at the Ce-

darville Post Office. It stemmed more from his view that employees should be forced to tow the company line than from a recognition that positively motivated employees are generally happier and more productive. Conover's negative conduct was, moreover, a result of his feeling that Ferrero had crossed him and in his attempt to show her co-workers how harshly he would treat them if they crossed him.

Ferrero errs by using the term "retaliation" in a macro-level sense rather than as "retaliation" is construed under the Rehabilitation Act. In the macro-level sense, Conover retaliated against Ferrero during July and August 1997, because he believed she was lying about her injuries, and because she was taking sick days and working under physician-imposed restrictions. This, as discussed above, was not the specific type of retaliation prohibited by the Rehabilitation Act, because Ferrero did not engage in an activity protected by the Rehabilitation Act until she filed her EEO complaint in September 1997. Conover, consequently, did not hold an intent to retaliate against Ferrero for her legally protected activities until September 1997 at the earliest. He did not thereafter take an adverse employment action against her, i.e., retaliate against her in violation of the Rehabilitation Act, until he terminated her employment in May 1999.

Accordingly, Ferrero has not shown that Conover's conduct in July and August 1997 constituted constructive discharge in violation of the Rehabilitation Act. She is therefore entitled to back pay damages from the date of her termination on May 29, 1999. These damages are properly calculated as follows:

| YEAR | LOST WAGES | BENEFITS | | |
|------|-----------|----------|---|---|
| 1999 [13] | $ 15,458 | $ 5,458 | | |
| 2000 | $ 31,600 | $11,060 | | |
| 2001 | $ 41,300 | $14,455 | | |
| 2002 | $ 41,100 | $14,385 | | |
| 2003 | $ 41,100 | $14,385 | | |
| 2004 [14] | $ 27,400 | $ 9,590 | | |
| TOTAL | $197,958 + | $69,333 | = | $267,291.00 |

Ferrero has established by a preponderance of the admissible evidence that she incurred lost wages and benefits in these amounts. She is therefore entitled to recover a total of $267,291.00 in back pay damages.

### 3.

### *Front Pay*

■ Ferrero is eligible for an award of front pay (wages and benefits), because her testimony and Dr. Burch's opinions establish by a preponderance of the admissible evidence that Ferrero is unable to return to work for Defendant. Ferrero is also not seeking an Order requiring Defendant to reinstate her to her former position or to place her in another similar position. *See* Tr. 750, 752.

However, Ferrero's front pay damages are subject to reduction because she has not met her duty to mitigate her damages. An award of front pay is equitable in nature. The decision whether or not to award front pay is therefore, from the outset, within the discretion of the Court. *See Lussier*, 50 F.3d at 1108;

A former employee who has been the victim of employment discrimination has a duty to use reasonable diligence to find other suitable employment. *See Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982); *see also Lussier*, 50 F.3d at 1108; *Shore v. Federal Express Corp.*, 777 F.2d 1155, 1157 (6th

13. Plaintiff worked 5 months in 1999, so 7 months of 1999 remained after she was constructively discharged. 7/12 of the amount the replacement employee made in 1999 is: $15,458 and $5,410 in benefits.

14. The calculations for 2004 are based on lost back pay and benefits through August 2004 (8 months of 2004).

Cir.1985). This duty applies to plaintiffs seeking front pay damages due to proven violations of the Rehabilitation Act. *See Lussier,* 50 F.3d at 1108.

Ferrero is not entitled to an award of front pay damages, because she has not used reasonable diligence to find suitable employment. Ferrero acknowledged during her testimony that she had not applied for any jobs since her termination. She explains that on one occasion when she sat in front of her friend's shop, she got "really nervous." (Tr. 844). Although she contends that she has been unable to work due to her psychological injuries, Dr. Burch's opinions support the conclusion that she will never be able to return to work for Defendant, not that she will be never be able to work at any job due to her retaliatory termination. *See* Defendant's Exh. 45 at 26. Dr. Burch opined, on January 11, 1998, "I do expect that she will be gainfully employed in some other setting soon after the resolution of this unfortunate situation." *Id.* While Dr. Burch did not explain what event would constitute "resolution of this unfortunate situation," it is reasonable to conclude that this occurred when her employment was terminated, and she was not subject to further acts of retaliation by Conover.

Lastly, Ferrero has not cited to any evidence of record to support the contention that she is physically unable to ever return to work. *See* Doc. # 120 at 45.

Accordingly, Ferrero is not entitled to an award of front pay damages.

## H. *Sanctions*

### 1.

### *Defendants' Discovery Misconduct*

Through her Request for Production of Documents on September 20, 2000, Ferrero sought information concerning her personnel documents, compensation and wages, payroll records, earnings records, overtime records, and other related documents. *See* Plaintiff's Exh. 1 at Request # s1, 2. As a result, Ferrero sought the information contained in Defendant's Exhibit 44 concerning the number of hours she worked during her employment with the Postal Service. (Tr. 168–69; *see* Plaintiff's Exh. 26). Defendant, however, failed to produce this information or a document containing this information but instead referred Ferrero to other documents Defendant had produced. Defendant also objected on the ground that the Request was overly broad and that production would be unduly burdensome. (Doc. # 31 at 4).

In June 2003, Ferrero filed a Second Amended Complaint raising, for the first time in this case, her FMLA claim. (Doc. # 70). Ferrero's attorney reasonably concluded that she was an eligible employee based on Ferrero's memory concerning the days and hours she worked. It was reasonable to rely on Ferrero's memory given that she had sought information about the number of hours she had worked, given that her FMLA eligibility fell short by only small number of hours, and given that Defendant had not produced any information contradicting her memory. The reasonableness of the conclusion that Ferrero was an eligible employee under the FMLA was further demonstrated by the Second Amended Answer in August 1997 wherein Defendant specifically admitted that Ferrero was an FMLA eligible employee. (Doc. # 69, ¶ 52).

In July 2003, the Court granted Ferrero leave to file a Third Amended Complaint naming the Postal Service as the FMLA Defendant. (Doc. # 95). Soon thereafter Ferrero filed her Third Amended Complaint and in August 2003 the Postal Service filed its Third Amended Answer. In its Third Amended Answer, the Postal Service changed its admission concerning Ferrero's FMLA eligibility by specifically

denying that she was an FMLA eligible employee. (Doc. # 104, ¶ 52).

On September 10, 2003, the day before trial began, Ferrero submitted to the Postal Service her Third Request for Production seeking information specifically concerning her FMLA claim. (Doc. # 109). There is no dispute that Ferrero had sought this information as early as September 21, 2000 when she requested, "All documents concerning the plaintiff, including all personnel..., compensation and wages, benefit..., attendance..., and all other documents and files." (Plaintiff's Exh. 26 at 1–2; see Tr. 168–70). Ferrero also sought at this earlier time, "All plaintiff's payroll records, earnings records, and overtime records." (Plaintiff's Exh. 26 at 2).

On the first day of trial, Thomas Lang, the Postal Service's Manager of Human Resources, Cincinnati District, testified under direct examination by the Postal Service's attorney as follows:

> Q. This morning did you contact one of your subordinates and ask them to determine how many hours Ms. Ferrero had worked in the 1996 and 1997 timeframe?
>
> A. Yes.

(Tr. 157). Lang explained that at his request one of his staff members and a member of the Postal Service's finance department "pulled information ... from out personnel data site in Minnesota and pulled the payroll journals. Added the payroll journals together for that period July 20, 1996 through August 1 of 1997." (Tr. 157–58). Lang testified that based on the data gained in this way, he learned that Ferrero's total work hours, with adjustments, equaled 1,225.29. (Tr. 157, 160).

When discussing the actual payroll records produced that morning, Lang explained that the person obtaining this information accessed the Postal Service's computer system by putting in a request to the payroll office in Minnesota. (Tr. 164). He testified, "It's done all the time...." (Tr. 164).

Most significantly, even though Ferrero sought this information as early as September 21, 2000, the first time either Ferrero or her attorney saw these documents was on the first day of trial on August 4, 2003. (Tr. 168–70).

Defendant presented and relied on Defendant's Exhibit 44 during Lang's testimony. Through this Exhibit and Lang's testimony, Defendant explained its position that Ferrero had not worked sufficient hours to establish that she was an FMLA eligible employee.[15] This information was highly relevant to her FMLA claim and, as discussed above, was sufficient to defeat this claim. *Supra*, § III(F).

### 2.

### *Rules 26(g) and 34(b)*

Rule 34(b) of the Federal Rules of Civil Procedure required Defendant to produce the information contained in Defendant's Exhibit 44 in its response to Ferrero's September 21, 2000 Request for Production of Documents. This Request for Production sought documents containing this information. In contrast to Defendant's initial objections, Ferrero's Request for Production number two was not overly broad; it was sufficiently specific by seeking "payroll records, earnings records, and overtime records." (Plaintiff's Exh. 26 at 4). Also in contrast to Defendant's objection, Ferrero's Request for Production number two was not unduly burdensome.

---

**15.** James D. Bryant, a Postal Service in Defendant's Finance Department, corroborated much of Lang's testimony. *See* Tr. 878–84.

In fact, once Defendant saw a possible advantage to its trial preparation, the information was easily obtained by Lang from the Postal Service's payroll office in Minnesota. This, moreover, was an obvious place to look for such records at the time of Ferrero's Request for Production in September 2000, since the payroll office had this information computerized and since searches for this type of information were—according to Lang—"done all the time.... " (Tr. 164).

Not only did Defendant fail to comply with Rule 34(b), Defendant's attorney failed to conduct a reasonable inquiry to support Defendant's discovery responses as required by Fed.R.Civ.P. 26(g). This Rule required Defendant's attorney to conduct a reasonable inquiry. *See* Fed. R.Civ.P. 26(g)(2)-(3). "Rule 26(g) imposes on counsel an affirmative duty to engage in pretrial discovery responsibly and 'is designed to curb discovery abuse by explicitly encouraging the imposition of sanctions.'" *Metropolitan Opera Ass'n., Inc. v. Local 100, Hotel and Restr. Employees Intrn. Union,* 212 F.R.D. 178, 219 (S.D.N.Y.2003)(quoting in part Advisory Committee Notes to Rule 26(g)). "[T]he Rule 'provides a deterrent to both excessive discovery and to evasion by imposing a certification requirement that *obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection.* A 'response' includes ... responses to production requests.'" *Id.* (quoting, with emphasis added, Advisory Committee Notes to Rule 26(g)). An objective standard applies to determining whether a attorney conducted a reasonable inquiry under the particular circumstances he or she faced. *See* Advisory Committee Notes to 1993 Amendment, Rule 26(g).

In the *instant case,* viewed under the particular circumstances Defendant's attorney faced when preparing a response to Ferrero's Request for Production, Defendant's attorney failed to conduct a reasonable inquiry. At best, Defendant's attorney simply failed to stop and think about Defendant's response to Ferrero's Request for Production. By making as little as one or two phone calls to Lang or to Defendant's payroll office, Defendant's attorney would have obtained the payroll information contained in Defendant's Exhibit 44. Lang, moreover, had been involved in this case from the beginning: he was first notified of it in 2000; he attended the mediation, and Defendant presented him (and he was deposed) as Defendant's Rule 30(b)(6) witness. (Tr. 130-32). Lang was, consequently, an obvious person to ask for the information in Defendant's Exhibit 44; he was not an obscure witness who could have been overlooked in good faith.

In addition, the timing of the investigation Defendant's attorney eventually conducted demonstrates that her original failure to investigate was more than a simple failure to stop and think; it was a bad faith evasion of her duty to reasonably investigate. Defendant's attorney waited until very near the first day of trial to seek this information. Defendant's attorney easily obtained the information in Defendant's Exhibit 44 on the first day of trial. This is shown through Lang's trial testimony when he stated that he simply asked one of his subordinates to find the information on the first morning of trial. (Tr. 157–58). The ease with which Lang obtained this information leaves no doubt that Defendant attorney failed to conduct a reasonable inquiry in support of Defendant's responses to Ferrero's September 20, 2000 Request for Production of Documents. Defendant's attorney, moreover, has not presented any meaningful explanation—let alone a substantial justification as required by Rule 26(g)(3)—of why this was not done in late September or early October 2000. *See* Tr. 432–42, 445–46.

Accordingly, pursuant to Rule 26(g)(3), Ferrero is entitled to an award of the reasonable attorney fees and expenses she incurred in prosecuting her FMLA claim, including but not limited to the time her attorney spent in pretrial preparation of this claim and in prosecuting this claim during trial.

## I. Ferrero's Remaining Motion for Sanctions

On June 24, 2003, the Court granted Ferrero's Motion for Sanctions against Defendant because Defendant failed to participate in the November 25, 2002 mediation session in good faith (Doc. # 66). On July 22, 2003, the Court overruled Defendant's Motion to Reconsider. (Doc. # 67).

Ferrero thereafter filed her Attorney Fee Submission, which was docketed as a Motion for Attorney Fees (Doc. # 100), requesting $13,680.29 (42.3 hours × $300 per hour, plus $990.29 in expenses).

Defendant contends that the sum of $13,680.29 is excessive, because (1) the rate of $300 per hour is inflated, (2) the number of hours charged is excessive, and (3) the expenses are unreasonable.

A party is entitled to recover only reasonable attorney fees. *Welton v. Osborn*, 124 F.Supp.2d 1114, 1120 (S.D.Ohio, 2000). "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on litigation multiplied by a reasonable hourly rate." *Id.* at 1121 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). When calculating attorney fees, the court may consider, among other things, the time and labor required...and...the customary [attorney] fees. *Paschal v. Flagstar Bank*, 297 F.3d 431, 433 (6th Cir.2002). Excessive,

redundant, and unnecessary hours are excluded. *Welton*, 124 F.Supp.2d at 1121.

The Court finds that an hourly rate of $300 for attorney fees is excessive for the Dayton area. Previously in this case the Court granted sanctions based on a reasonable hourly rate of $240. Although Ferrero has produced affidavits by attorneys in support of her attorney's $300 per hour rate, these affidavits do not indicate a prevailing market rate specifically for attorneys who practice employment law in Dayton, Ohio. Since about two years have passed since the $240 per hour sanction, it is reasonable to increase the hourly rate to $250 per hour.

Additionally, in light of Defendant's objections (Doc. # 108) and the Court's careful consideration of the time Ferrero's attorney billed for each task, the Court finds that the amount of time he spent on the listed tasks was reasonable. The Court has also considered Ferrero's claimed expenses and finds them reasonable.

Accordingly, the Court finds that Ferrero may recover a total of $11,565.29 ($250 per hour × 42.3 hours + $990.29 in expenses) in reasonable attorney fees.

## IV. CONCLUSIONS

The Court concludes as follow: (1) Ferrero has proven by a preponderance of the admissible evidence that Defendant retaliated against her in violation of the Rehabilitation Act; (2) Ferrero's remaining claims lack merit; (3) Ferrero is entitled to back pay damages from May 29, 1999 to the date of Judgment; (4) Ferrero's remaining claims lack merit; and (5) Defendant's discovery misconduct warrants sanctions under Fed.R.Civ.P. 26(g) in the amount of the attorney fees Ferrero incurred in preparing and litigating her FMLA claim.

**IT IS THEREFORE ORDERED THAT:**

1. Judgment is entered in favor of Plaintiff Leslie Ferrero and against Defendant Postmaster General of the United States Postal Service in the amount of $267,291.00 on her retaliation under the Rehabilitation Act;

2. Judgment is entered in favor of Defendant Postmaster General of the United States Postal Service and against Plaintiff Leslie Ferrero on her remaining claims under the Rehabilitation Act;

3. Judgment is entered in favor of Defendant United States Postal Service and against Plaintiff Leslie Ferrero on her claim under the Family and Medical Leave Act;

4. Plaintiff Leslie Ferrero's Motion for Sanctions (Doc. # 100) is GRANTED, and Defendant shall pay Plaintiff $11,565.29 ($250 per hour × 42.3 hours + $990.29 in expenses) in reasonable attorney fees;

5. The parties shall in good faith attempt to informally resolve any dispute over the amount of attorney fees Plaintiff incurred in preparing and litigating her FMLA claim. The parties shall file a joint written report regarding the status of their negotiation *on or before September 24, 2004.*